This action is by the Tobacco Growers Cooperative Association, organized under the Cooperative Marketing Act of this State, Laws 1921, ch. 87, against one of its grower members to enjoin him from delivering and selling to parties other than plaintiff association portions from his 1922 crop of tobacco, and asking to recover, also, liquidated damages for the tobacco sold by him prior to the commencement of this action. The appeal is from the order granting the injunction pendente lite
entered on 18 October, 1922, by Daniels, J., at chambers.
Said cooperative association is a nonprofit corporation, without capital stock. Its members are growers of tobacco in North Carolina, Virginia, and South Carolina. Prior to its organization, there was circulated through said states a form of association agreement whereby growers agreed to become members of the proposed marketing association, and upon due incorporation, bound themselves to deliver to it all the tobacco produced by them for a period of five years.
Among the signers of this agreement was the defendant W. T. Jones. Notwithstanding this agreement to deliver his tobacco to the association, he sold part of this 1922 tobacco upon the warehouse floor, and has announced that he will not deliver any of the remainder thereof to the association, but will continue to violate his contract.
The association, therefore, under the terms provided by the Cooperative Marketing Act has brought this action against him for liquidated *Page 282 
damages covering the tobacco already sold and for an injunction to prevent further breach of his contract. A temporary restraining order was issued, together with notice to show cause why an injunction pendente lite should not issue. At the hearing the motion for an injunction (268) pendente lite was granted, and the defendant appealed.
The defendant contends that the Cooperative Marketing Act is unconstitutional and void, and that the contract between plaintiff and defendant is invalid because in restraint of interstate and intrastate commerce; and, therefore, that the injunction was improvidently granted.
The plaintiff contends that the Cooperative Marketing Act is constitutional, and that a cooperative marketing association organized for the handling of its members' products only is entitled to an injunction against the grower member who threatens to breach his marketing agreement; that the marketing agreement is not in restraint of interstate commerce nor violative of any Federal anti-trust law or law against monopolies, and does not violate the statutes, public policy, or Constitution of this State.
The Cooperative Marketing Act under which the plaintiff association is organized, Laws 1921, ch. 87, is an enabling act whereby a particular kind of organization may be formed. Any persons able and willing to avail themselves of the provisions of the act may organize such cooperative association. Section 1 of said act declares its purpose to be: "In order to promote, foster, and encourage the independent and orderly marketing of agricultural products through cooperation, and to eliminate speculation and waste, and to make the distribution of agricultural products as direct as can efficiently be done by the producer and consumer, and to stabilize the marketing problems of agricultural products, this act is passed."
The act provides in substance that any five or more persons engaged in the production of agricultural products may from a nonprofit cooperative association to engage in any activity in connection with the marketing and selling of the products of the members of such association, but that such association can handle only the products of its members, and producers only are eligible to membership; the articles of incorporation contain the provisions required in the incorporation of business corporations, and, in addition, there must be a statement showing whether *Page 283 
the association is organized with or without capital stock; whether the property rights of the members shall be equal or unequal; if unequal, general rules must be made applicable to all members whereby property rights will be determined, and these rules must apply to new members as well as old, and may not be changed except by consent of three-fourths of the members. These articles must be filed in (269) the same manner as those of any other general business corporation, and a certified copy must be filed with the Chief of the Division of Markets.
There are also provisions requiring a code of by-laws protecting the rights of members and conserving the status of the association as a nonprofit corporation for cooperative marketing of its members' products with the usual stipulations for the time, place, and manner calling and conducting meetings; the number of members constituting a quorum; the right to vote by proxy, and the power and duties of officers and directors.
There is also provided that the marketing contract between the association and the members may be embodied in the by-laws, which shall determine the method of permitting the withdrawal of members or transfer of stock; the conditions upon which membership shall cease and the automatic suspension of a member when he ceases to be a grower. Upon death, withdrawal, or expulsion of a member, his interest in the association must be appraised and the value of that interest must be paid to his heirs or to himself, as the case may be.
Ten per cent of the members may petition the directors for a special meeting, and the directors must thereupon call such meeting. The directors may be elected by districts, so as to give the membership proportionate and equitable representation. One of the directors is required to be appointed by the director of agricultural extension, or some other public official, in order to maintain through such representation direct public interest in and supervision of the management of the association. Besides, the governors of North Carolina, South Carolina, and Virginia have each appointed a director, who sits with the board in all its deliberations. This is not to control, but to keep the public in touch and fully informed as to the policy pursued by the association.
The election of officers is provided for, together with reasonable compensation for officers and directors, and, in order that cooperative associations may not be instrumentalities for private gain, it is provided: "No director during the term of his office shall be a party to a contract for profit with the association differing in any way from the business relation accorded regular members or holders of common stock of the association, or to any other kind of contract differing from terms *Page 284 
generally current in that district." It is further provided that the liabilities of members and stockholders are the same as in other corporations, but no stockholder may own more than one-twentieth of the common stock, and the by-laws may limit such stock ownership to an amount less than one-twentieth, and that in any event no member or stockholder can have more than one vote. Stock can be transferred only to a person (270) engaged in agriculture, whose products are handled by the association.
Provision is also made for the recall of officers or directors after a proper hearing, and any action of the board of directors may be referred to the members for decision upon the demand of one-third of the board. The association is authorized to make contracts with its members, requiring them to sell, for a limited period of time, all or part of their agricultural products. As the association is not permitted to handle the products of nonmembers, it was necessary to make special provision for the enforcement of these contracts. The law therefore permits liquidated damages in case of breach; indeed, such damages would have been allowed without any statutory provision: Bradshaw v. Milliken, 173 N.C. 434
(Walker, J.); Burley Tobacco Association v. Gillespie, 51 Ind. App. 583;Milk Producers Association v. Armstrong, 178 N.Y.S. 612; Castorland v.Schantz, 179 N.Y.S. 131; Ex parte Baldwin County Asso., 203 Ala. 345;Citrus Fruit Association v. Yeoman, 197 Pac. (Cal.) 959.
Damages, of course, are of no real value. The association must have crops to market or it will go out of business, therefore, relief in equity is provided, and it is an essential point in this case. Section 16-c of the statute therefore provides: "In the event of any such breach, or threatened breach, of such marketing contract by a member, the association shall be entitled to an injunction to prevent the further breach of the contract, and to a decree of specific performance thereof. Pending the adjudication of such an action, and upon filing a verified complaint showing the breach, or threatened breach, and upon filing a sufficient bond, the association shall be entitled to a temporary restraining order and preliminary restraining order against the member."
On account of the cooperative nature of the enterprise, and since it makes no profit, a grower who has breached his contract must pay the cost of suit, including premiums for bonds, expenses, and fees in the action. The membership of the association is limited to growers, and a contract breaker breaches his contract against his fellow-members, and it would be unfair to make them pay for his violation. The association has no profits with which to take care of this expense.
The association is required to make annual reports to the Division of *Page 285 
Markets of the State, giving a complete statement of its business during the past year, its total expenses, its indebtedness, and its balance sheet, thus further insuring public control of all its activities.
Section 26 provides: "The association not in restraint of trade. No association organized hereunder shall be deemed to be a combination in restraint of trade, or an illegal monopoly, or an attempt to lessen competition, or fix prices arbitrarily, nor shall the marketing contracts or agreements between the association and its members, or any agreement authorized in this act be considered illegal or in (271) restraint of trade."
The act establishes a complete plan of organization for cooperative marketing of agricultural products under the fullest public supervision and control. Every possible safeguard against private profit, manipulation by a few powerful members, and "squeezing out" of the weaker members and abuse of powers are embraced in the law.
This association is organized under this statute and pursuant to its provisions made a contract with the defendant as one of its members. The contract is first a cooperative association agreement, and second, a marketing agreement. The association agreement became binding at once; the marketing agreement became binding when accepted by the association, after incorporation. The agreement is signed only by growers of tobacco in North Carolina, Virginia, and South Carolina, and the signers state the object of the organization therein as follows: "The undersigned propose to organize a nonprofit association, without capital stock, for the purpose of promoting, fostering, and encouraging the business of marketing tobacco cooperatively, for reducing speculation, for stabilizing the local tobacco markets, for cooperatively and collectively handling the problems of tobacco growers," and for other pertinent purposes. Membership is limited to the actual growers of tobacco, or landlords who received rental in tobacco. A board of 25 directors is provided for, 22 of whom are elected by the members chosen by the voting districts so as to give all members an equitable and proportionate representation. The delegates are elected at a primary election, who choose the directors, one director being chosen for each district and one director each to be appointed by the governors respectively of the three states. Each member is limited to one vote, the entrance fee is fixed at $3; the association is confined to the marketing of tobacco, and has only tobacco producers for its members.
After stating the purposes as above, the agreement provides: "The association agrees to buy and the grower agrees to sell and deliver to the association all the tobacco produced by or for him, or acquired by him as landlord or lessor during the years 1922, 1923, 1924, 1925, and *Page 286 
1926." It is further provided that "All tobacco shall be delivered at the earliest reasonable time after the picking or curing to the order of the association at the warehouse or plant controlled or specified by the association"; and that "The association shall pool or mingle the tobacco of the grower with tobacco of a like type, grade, and quality delivered in the same crop by other growers. The association shall classify the tobacco and its classification shall be conclusive." It is also provided that the association shall resell all tobacco at the best price obtainable and pay net profits to the grower, the cost of operation and overhead will be deducted, but the association is forbidden to make any (272) profit for itself; and further, it is provided that the net proceeds shall be divided ratably among the growers in proportion to their deliveries to each pool.
Then there is the provision that the member shall deliver all the tobacco he raises as follows: "This agreement shall be binding upon the growers as well as upon him who produces tobacco, directly or indirectly, or has the legal right to exercise control of any commercial tobacco or any interest therein as producer or landlord during the term of this contract" — that is, for the five years named in the contract. It is also specially provided in the contract that should the grower fail to so sell and deliver all his tobacco, he agrees to pay to the association for all tobacco delivered, consigned, or marketed either by or for him, other than in accordance with the terms hereof, "the sum of five cents per pound as liquidated damages," and that "in the event of a breach or threatened breach of any provision regarding delivery of tobacco, the association shall be entitled to an injunction to prevent the further breach thereof, and to a decree for specific performance"; and that the grower who makes a breach of this contract shall be liable for "all costs of litigation and all necessary expenses caused thereby," and that no oral or other conditions shall vary the written contract which it is stipulated contains the entire agreement of the parties. This, somewhat condensed, states the powers and the terms of contract under which the plaintiff association is acting.
Section 26 of the statute provides, as above stated: "No association organized hereunder shall be deemed to be a combination in restraint of trade or an illegal monopoly, or an attempt to lessen competition, or fix prices arbitrarily, nor the marketing contract or agreement between the association and its members, nor any agreements authorized in this act be considered illegal or a restraint of trade."
The constitutionality and validity of this statute are determinative of this controversy, and, in effect, cover the entire subject of this litigation.
Agriculture is the greatest business in this country, and as said in *Page 287 Bickett v. Tax Commission, 177 N.C. 439, "By the census, 81 per cent of the people in this State are engaged in farming." In that case, Laws 1919, ch. 168, entitled "An act to provide improved marketing facilities for cotton," was held constitutional and valid, and that decision is practically conclusive of this case. The object in view of that statute, as in this, was to protect the farmers against combinations by which they were forced to accept in the sale of their produce prices fixed by combinations of buyers or manufacturers, and it was intended to give them an opportunity by agreement among themselves to dispose of their products under regulations which would protect them. There was no intention, and it is clear there is nothing in this State, to enable the producers to combine to sell their products at a profit beyond what would be a fair and reasonable market price. Indeed, this (273) would be impossible on the part of the producers, as only a part of them would in any event belong to such an organization; whereas, the manufacture of tobacco, being in comparatively a few hands, the buyers could combine, as they have done for many years, in a so-called "gentlemen's agreement" to fix the price which would be paid for the raw product and agree in the same way upon a price for the manufactured product, with the well known result that the producers of tobacco, the farmers, have received the bare cost of production in this artificial market, and not always that, while the combination of tobacco manufacturers have accumulated vast fortunes.
In view of the necessity of protecting those engaged in raising tobacco against the combination of those who buy the raw product at their own figures and sell it to the public at prices also fixed by themselves, this movement has been organized.
By a careful examination of all the provisions of the act under which the association is acting, it will be seen that every precaution has been taken to insure that it will not be used for private gain, and can operate only for the protection of the producers.
In Mar-Hof Co. v. Rosenbacker, 176 N.C. 330, the whole subject is admirably discussed by Mr. Justice Hoke, in which he states that originally at common law all agreements in restraint of trade were held void as being against public policy. This, however, he says has been more and more modified by the decisions of the courts until it has come to be a generally accepted principle that agreements in partial restraint of trade would be upheld when they are "founded on valuable consideration, are reasonable and necessary to protect the interest of the parties in whose favor they are imposed, and do not unduly prejudice the public interest," quoting Clark on Contracts. This same doctrine has been sustained in Bradshaw v. Millikin,173 N.C. 432. *Page 288 
In two notable instances, Standard Oil Co. v. U.S., 221 U.S. 1; and U.S.v. American Tobacco Co., ibid. 106, stipulations in partial restraint of trade were held not to be obnoxious to the law unless they were unreasonable and likely to become monopolies, which are obnoxious to our constitutional provisions, Const. of N.C. Art. I, sec. 31, which provides that "Monopolies are contrary to the genius of a free state, and ought not to be allowed."
An examination of this statute shows, we think, that this association is authorized for the purpose, not of creating a monopoly, but to protect the tobacco producers against oppression by a combination of those who buy, and not to authorize, and does not empower, those who produce the raw material to create a monopoly in themselves.
Indeed, it seems to us plain that the plaintiff, under the (274) provisions of its charter, is not and never can become a monopoly for many reasons: (1) As a corporation of North Carolina, the moment it should become dangerous to the public, if that were possible under the terms of its charter, the General Assembly can at any time repeal its charter (Const., Art. VIII, sec. 1), and the courts will intervene to prevent it becoming a monopoly. (2) The plaintiff has neither capital stock nor surplus, nor credit, except as given it by the statute, and this latter may be withdrawn at any time. It is wholly dependent upon its ability to borrow in large sums which is necessarily under the control of the Federal Reserve Banking System, and the moment it shall deny credit to the plaintiff its sufficiency would be destroyed. It can borrow from the Federal Reserve System, which is a function of the Government, only on such terms as that board deems consistent with the public welfare, and that board will not permit hoarding or monopolizing by the plaintiff. The power of the Federal Reserve System was shown in October, 1919, when by mere announcement of its policy it caused the deflation of the stock market. In May, 1920, when the operations of the War Finance Corporation were suspended by direction of the Secretary of the Treasury, so that it could not extend credit for the export of cotton, because cotton was scarce and a cotton famine was threatened, there resulted a drop in cotton of 30 cents a pound in six months. Therefore, were the plaintiff to attempt to monopolize the sale of tobacco, not only it would fail to control its sale by the large numbers of producers who are not members of the organization, but it would be faced with the power of the General Assembly to repeal its charter, and to put it into the hands of a receiver like the proposal in 1893 to abolish the Farmers Alliance Business Agency; and it would be denied the privilege of borrowing from the Federal Reserve Bank or any of its correspondents. *Page 289 
It would be subject to the visitorial powers of the Secretary of Agriculture under the anti-trust laws, and finally it would be confronted with the huge increase in the acreage devoted to tobacco and by the holding off from the market the normal production of any one year, the result would be the selling of two crops within a single year. As was well said by Mr. Pou, one of the counsel for the plaintiff, "these conditions make it physically, economically, and financially impossible for the plaintiff to become a monopoly."
The plaintiff will continue to exist only if it provides for a normal, orderly marketing of the tobacco crops, and by putting on the markets of the world annually the production for that year. Its sole purpose is by an orderly marketing of the crop to make large saving, and to secure to the producers a fair and reasonable price therefor without increasing the price the consumer will pay for the manufactured article. The sole object of the association is to protect the producer of the raw article from depression in the price by the (275) combination of the large manufacturing corporations controlled by a few men who can at the same time not only decrease the price to the producer, but can increase it at will to the consumer, and thereby accumulate in a few hands sums beyond computation. The cooperative association purposes to eliminate unnecessary expenses in selling, and to prevent artificially forced reduction in the price paid to the producers.
Instead of creating a monopoly, the object is by a rational method of putting the raw product on the market from time to time as there is a legitimate demand for its manufacture, and by the extension of credit to farmers to enable this to be done, to prevent a monopoly of the tobacco industry by those who manufacture it.
The defendant contends that the charter and contract contain unusual provisions restricting the rights of the members; but, in the first place, every member becomes so voluntarily. Each grower of tobacco has the privilege of joining or not, as he sees fit, and no one else can do so. The terms of the statute and the contract as set out in this record are plain, and there is nothing concealed.
It is also argued that the cooperative marketing system is a detriment to the public, but no citizen not a member has seen fit to intervene upon an allegation that the public has been injured. No person has come into court and said that he has been deprived of any rights, and the courts will only hear those who make such assertion upon the proper proof.
Again, it is charged that some of the money of this corporation is used in the formation of subsidiary or minor companies which will process tobacco, redry it, store it, prize it, and get it ready for market. This is *Page 290 
true, but the amount of money that can be used for this purpose is very small, is specifically limited, and there is a complete system prescribed for its return to the persons who contributed it. The facilities named are necessary in the tobacco business; and unless the cooperative association owns or controls enough of these facilities to handle the tobacco it will own, it will be at the mercy of its competitors.
It is common knowledge that two years ago the cooperative marketing of peanuts in northeastern North Carolina and southeastern Virginia was paralyzed because the cooperative association did not own cleaning establishments. They were dependent on their enemies to do the cleaning for them, and those enemies easily imposed such terms as absorbed all profit. Now the peanut corporations, like the cotton and tobacco, are provided with all facilities.
The enemies of the cooperative system would be delighted if the courts were to hold that a cooperative association is not permitted to use its own money in establishing warehouses, prize houses, redrying and processing plants, and were forced to depend for these facilities upon such terms as the association could make with its competitors. The (276) latter would be in the position of an army well armed, meeting in battle another army with no arms at all.
The cooperative association is merely granted by the statute the privilege of building or constructing the necessary instrumentalities for carrying out the purposes of the association, and of using its own money therefor, under terms and conditions specified in the contract and agreed to by all its members. The cooperative marketing system has justified itself.
When the World War ended there was a scarcity amounting almost to destitution in some sections, and in others there was so great an abundance that the producers could not obtain a reasonable living. For the producers of agricultural products the prices were low, and there was no profit. To the consumer prices were so high that consumption was restricted, and something like famine prevailed. These extremes existed in the same county and at no great distance apart. Middlemen, speculators, and people who stood between the producers and consumers derived execessive [excessive] profits from this situation, while the producers and laborers were denied a living, and from the consumers were extorted enormous profits. It was the hey-day of profiteering.
The cooperative marketing system was forced into existence to guarantee fair prices to the producer, a fair wage for labor, and to prevent extortion upon the consumer. It increased consumption by furnishing the consumer a regular supply at less price, and at the same time enabled the laborer and the farmer to obtain a remunerative return. In *Page 291 
addition, the cooperative system eliminated unnecessary expenses and costs as well as the enormous speculative profits realized by combinations which had taken control of the entire process between the producer and consumer. For instance, when the cotton crop began to be marketed in October, the price dropped, and the farmer was forced to sell to meet the bills he had incurred for fertilizers, and the money borrowed for the payment of labor, and as it dropped there was a progressive pressure for further reduction in price and the returns to the farmer were pitifully inadequate; but when the cotton had thus been forced from the hands of the farmer upon the market, the great combinations, which had bought up the crop at the low prices, realized enormous profits by the sale of the cotton at high prices during the seasons when there was no longer cotton in the hands of the farmer.
It is current knowledge that during this year something like two million bales of the cotton crop have been controlled by the cooperatives. They did not dump this cotton on the market. The cotton cooperative association borrowed from the Federal Reserve; advanced to the farmers, and enabled them to hold the cotton in the warehouses provided for that purpose. Cotton opened at about 20 cents in (277) September, but instead of going down, as heretofore, it has risen steadily, and is now around 30 cents. This may not be due entirely to the cooperatives, and to some extent can be accounted for by the smaller size of the cotton crop, but the cooperative system has been a material factor.
The Tobacco Cooperative Association has been the offspring of a similar situation. Individual fortunes, aggregating many hundreds of millions of dollars in a few hands, have been created by the sale of the tobacco crop at prices fixed, as is well known, by a "gentlemen's agreement" among the manufacturers, who are few in number and strong financially, who at the same time have kept up, by similar agreements, the prices of the manufactured article to the public.
There is no analogy between the proceedings to dissolve the great trusts which have benefited by this system, as in the Standard Oil and AmericanTobacco cases, and others, and these associations for the protection of the producers of cotton, tobacco, and peanuts, to market and to create facilities by which their crops will be placed upon the market gradually as called for and not dumped into the hands of great financial associations at a financial sacrifice to the producers to be resold or manufactured at great profit. It is an entire misunderstanding of the facts to assert that an orderly, systematized cooperation among the producers to prevent a sacrifice of their products and to realize a living wage for the laborer and a reasonable profit for the producers has any analogy *Page 292 
to the system by which great combinations of capital have prevented the laborer and the farmer alike from realizing a reasonable reward and a decent living.
In fact, the cooperative system is the most hopeful movement ever inaugurated to obtain justice for and improve the financial condition of farmers and laborers. The producers are paying all the costs and assuming all the responsibilities of these cooperative associations. They are taking all the risks. They are asking no assistance from the public treasury. They are forcing no one to join, and they are exacting no inordinate prices for their product. They are associating themselves as authorized by the statute, like other persons, and they have signed mutual and fair agreements among themselves which will be futile unless those who have signed such agreements can be held to abide by the terms of their contracts.
It must be noted that the provision that the association exists for the term of five years is merely the same provision that fixes a term of years for the existence of all other incorporations. There is nothing in the charter, or in the contract, which contemplates or authorizes the holding of these products for the term of five years. It would be destructive of the object of the association were this even attempted, for it (278) would force the sale in the second year of two years crops and in the third year of three years, which would destroy the very purpose of the association. Besides, not only would the Legislature interfere to repeal the charter, but if this were attempted the association would be without the means to advance funds to their members to carry on their operations and the courts would intervene in such case to forbid such a result which would be illegal at common law.
The provision for the appointment of a director by each of the governors of the three states of Virginia, North Carolina, and South Carolina is not based, as the defendant contends, upon the idea that three directors can control the other twenty-two. But the three directors appointed by the governors of the states named are there that the public may have opportunity to learn at all times how the business is being conducted and to insure that it will not be carried on in a manner that will be detrimental to the public welfare. In short, they are placed on the board to prevent secrecy and to guarantee publicity, and in order that the public may be kept in touch and fully informed as to all the proceedings of the cooperative association.
If there had been the same provision in the incorporation of the Standard Oil Company, the American Tobacco Company, the steel trust, and of great railroad companies and all great financial combinations whose operations vitally affect the public at large, it would have been a *Page 293 
great benefit to the people, and have prevented enormous abuses. It certainly cannot be an objectionable feature here.
The legality of these associations has been upheld in many decisions in other courts, but after what has been recited as to the terms of the charter and of the contracts and the reasons just given, it would be merely vain repetition to show that other courts have taken the same view that we have expressed.
Without quoting, therefore, from the numerous decisions which have reached the same result, it may not be invidious to say that the whole subject has been fully discussed and the same conclusion reached in the very recent case of the Cooperative Association v. Lentz by the Supreme Court of Oregon, in an opinion filed on 13 February, 1923, 212 Pac. Reporter, 811-819. The association in that case, while essentially of the same nature with the one at bar, concerned not tobacco or cotton, but the marketing of loganberries. The principles applicable, however, are the same, and the Court held that the association was valid.
These are matters of general knowledge and of public interest, of which the courts take judicial notice. In Owen County v. Brumback,128 Ky. 152, the Court, taking judicial cognizance of such facts, said: "The farmers scattered all over the State, each acting independently and separately for himself, were unable to dispose of their crops at a fair and reasonable price. There was practically no (279) competition among the purchasers of their crops. A combination and trust had been formed by the buyers to depreciate the value of the crops below their real value, and, single-handed, the producers were unable to combat or deal on terms of equality with these trusts and combinations that controlled that markets in which the farmers were obliged to dispose of their products. To meet the condition of affairs thus presented, and to enable the farmers to combine their resources and place their products in the hands of an agent selected by them, to the end that better prices might be obtained, this (cooperative act was passed."
In Burley Tobacco Company v. Gillespie, 51 Ind. Appl. 593, the Court, quoting the above, said "In the above case the Court held that a statute authorizing the pooling of crops for the purpose of depreciating any commodity below, or enhancing it above, its true value would be in violation of the constitutional provision, and any pool or combination entered into for such purpose would be invalid. But in the absence of some allegation and proof that such was the purpose of the combination, courts would indulge the presumption that the party, by entering the combination and by the execution of such contract, intended only to enter into such engagements as were lawful, and such contracts should, *Page 294 
in the absence of allegations and proof to the contrary, be construed as limited to lawful purposes under the statute and Constitution."
In Commonwealth v. Hodges (1910), 130 Ky. 246, the Court said: "The conditions which gave rise to the act are known of all men. At the time of its enactment there was but one buyer for the farmers' tobacco. It matters not how hard he labored, how valuable his soil, or fine the quality of the crop he raised, he was obliged to accept whatever that buyer might offer. Indeed, in many instances the buyer absolutely refused even to examine his crop or to make any offer at all. Instead of the plenty to which the farmer was accustomed, and to which he was entitled, he stood face to face with privation and want. As individuals, the farmers were unable to cope with the situation." Quoting this case, the Indiana Court, above quoted, said: "While these cases carry the rule of judicial knowledge far, it is clearly the law that the courts will take judicial cognizance of the history of the country and the facts of common knowledge which go to make up its history. To hold that courts do not judicially know that in the year 1909 there was in this country a combination among the manufacturers of tobacco, which controlled the leaf tobacco market, and known as the Tobacco Trust, would be to impute to courts a lack of knowledge possessed by the public generally. Moreover, the authorities seem to recognize an exception in cases presenting facts similar to those averred and judicially recognized in the case before us. In Greenhood Public Policy, 645, the rule is (280) laid down that combinations to raise prices to a reasonable point are valid among men engaged in business which had become ruinous, especially when their operation is limited in every essential particular." Similar rulings have been made in many cases that the courts would take judicial notice of these well known facts of universal knowledge.
Every word of these decisions apply with the utmost force to the situation in this State, where these facts existed to the extremest degree with the resulting injury to the tobacco farmers of the State and the accumulations of enormous profits by the trusts, whose stocks have been sold in great amounts, and which, when sold, are by statute made free from all taxation in the hands of the purchasers.
The operations of these buying trusts have been fully detailed in many decisions of the courts, notably in the Standard Oil and American TobaccoCompany cases, in the latter of which their operations are graphically summed up by Chief Justice White for a unanimous Court as an "ever-present manifestation which is exhibited of a conscious wrong-doing by the form in which the various transactions were embodied from the beginning, ever changing, but ever in substance the *Page 295 
same." U.S. v. American Tobacco Co., 221 U.S. 182. It is thus that our highest Court has described the methods by which the producers have been stripped of the lawful returns for their labors, and against which these cooperative associations have been organized and chartered as their protection.
In this record there is no averment in the complaint or provision in the contract disclosing that appellant, by reason of the pool, proposed to sell the tobacco of appellee for a sum greater than its true and actual value, and all presumptions will be indulged in favor of the legality of the contract, and such presumption will only yield when its illegal character plainly appears. It may be well admitted that the statute under which the plaintiff association was organized was enacted by the Legisture [Legislature] to empower the tobacco farmers in this State to protect themselves against the restraint of trade in a market which was controlled by a trust of tobacco manufacturers, and had been so controlled for many years. There is no other motive or purpose that can be suggested. The purpose of the combination of the farmers joined, in this association does not appear to be, in the language of the Indiana decision, "Other than to secure a fair and adequate price for the growers' product. We think such acts could not be held to be in conflict with the morals of the time or to contravene any established interest of society. Public policy does not ask that those who till the soil shall take less than a fair return for their labor. Public policy safeguards society from oppression; it is not an instrument of oppression."
In Ex parte Baldwin County Producers' Corporation,203 Ala. 345, decision filed 26 June, 1919, and rehearing (281) denied in October, 1919, an association, authorized in almost the identical language of the statute in this State, was held valid and not obnoxious as being in restraint of trade, and a large number of decisions in other states are there cited in support of the ruling.
In Citrus Fruit Association v. Yeoman, 197 P. 959, the Supreme Court of California affirmed a similar statute and the legality of a similar association, saying: "It will not be inferred without proof of the fact that an organization, the purposes of which appear to be legal and legitimate on its face, is actuated by a hidden design to operate in a way that is prohibited by law." This opinion was filed 16 May, 1921.
There are numerous other decisions to the same effect, among them, R. R.v. Tobacco Co., 147 Ky. 22.
In Castorland Milk Co. v. Schentz, 179 N.Y.S. 131, a similar organization was held valid; and the same was done in Milk ProducersAssociation v. Armstrong, 178 N.Y.S. 612.
Without cumbering this opinion with the citation of the numerous *Page 296 
decisions to this effect, it may be said that similar associations for the purpose of protecting the producers against the depression of the market value of their products by great combinations of capital, with substantially the same provisions as in the charter of the plaintiff and its contract with its members, have been held valid, and that the courts will not interfere unless there is allegation and proof that the real object and effect is to procure prices beyond the real value.
The history of cooperative marketing associations is admirably set out in an article in the Columbia Law Review for February, 1923, in which it is pointed out that "from year to year the movement towards the cooperative marketing of farm products is assuming greater scope and greater economic importance. On the Pacific coast the large fruit growers' cooperatives have become by far the most important factors in the marketing of citrus fruit, raisins and grapes, prunes and apricots, and similar products. The annual turnover of cooperative associations in California alone is approximately $300,000,000. In the wheat and corn belts cooperative county grain elevators have been a familiar feature for a generation, and their importance is said to be growing. Cooperative creameries and cheese factories play a significant part in the economy of dairy farming in the middle west. Associations of potato growers, of truck gardeners, of growers of berries, apples, and vegetables for canning or direct consumption have been known for years. It was estimated that in 1920 that there were at least 14,000 farmers' buying and selling associations in the United States. In an earlier estimate the annual business of cooperative marketing associations (282) in the United States was placed at about $1,000,000,000." The article then states that in the last two years, with financial assistance from the War Finance Committee under Congressional legislation, there has been a remarkable development of these cooperative associations in new fields. Giant marketing associations covering whole states, or even groups of states, have been organized with startling rapidity in the great cotton and tobacco growing states. In 1921 such associations were organized in Texas, Oklahoma, Mississippi, and Arizona to market cotton, and in Kentucky to market tobacco; and in 1922 cotton associations were organized in Arkansas, Alabama, Georgia, and North and South Carolina, and a tobacco association (the plaintiff in this case) covering North and South Carolina and Virginia, and other tobacco associations in Wisconsin, in the Connecticut Valley, and in Kentucky. Wheat growers' associations were organized in Oregon, Washington, Idaho, and Montana in 1921, and in Texas, Oklahoma, Kansas, and Nebraska in 1922, and it is estimated that such associations will handle during the present year 2,000,000 bales of cotton (worth at present prices *Page 297 
$300,000,000), and more than 75 per cent of all the tobacco. Rice growers' associations, this same article states, are operating in California, Arkansas, Louisiana, and Texas, and the peanut growers' association in Virginia handles over a million dollars worth of peanuts annually. These associations have become necessary, not only as a matter of justice, but also as a matter of existence to the producers of the great staples of the country and as a protection against the gigantic combinations of capital which have been taking all the profits, or more, which should have gone to the producers of the great staple crops of the country, and to furnish a reasonable decent wage for the laborers in such industries.
The article concludes with pointing out that "the profit incentive is the mainspring of commerce, but is the antithesis of cooperation. The cooperative principle requires its services to be performed for the cooperating members by their appointed representatives and not by independent business units dealing at arm's length and striving for profit. It implies that the cooperating members are the real parties in interest in any transaction undertaken by their association. At no time can the association, as a corporate entity, have any interest in the marketed product adverse to the interest of the members for whose benefit the operations are conducted. Yet, so far as it is possible without sacrificing this essential characteristic, the association must adapt itself to the usages of trade. The merchant who buys its products, the banker who lends its money, properly insist that there be a responsible legal entity with which dealings can be had; that the property contributed by the members be subject to the hazards of the venture in which it has been launched; that the officers of the association have the powers normal in the conduct of trade, and that no secret and unsual [unusual] restrictions hamper their authority in ordinary (283) business transactions. By conferring on the association legal title, with the powers of disposition which are incident to legal title, the members have successfully achieved this result. By insisting that this legal title exists for a special and limited purpose, for the benefit only of those who deal with the association in good faith and in the normal course of business, the rights of the members as the real parties in interest are preserved.
In U.S. v. Steel Corporation, 254 U.S. 417, it was held that when a court was asked to dissolve a corporation because in violation of the Sherman Anti-Trust Act, it must consider, not whether the corporation has the power to do so, but what it has done and is doing, for that act is directed against monopoly, and not against an expectation of it, and where the corporation did not achieve monopoly, and only has attempted to fix a protective schedule of prices, and has not been *Page 298 
detrimental to the public interest, or proven to be in restraint of trade, it will not be held illegal.
In our own Reports there are many cases holding that restrictions, no matter how unlimited, may be imposed if reasonably necessary. In Wooten v.Harris, 153 N.C. 43, a contract was attacked upon the ground that it violated the statutory provisions against agreements not to buy or sell goods with the intention of preventing competition in selling or to fix the price or to prevent competition in buying; but the Court held that there being no proof that the contract was made in order "that enormous profits may be extorted at the expense of the public," and it being reasonably necessary for the parties, the contract was valid.
In Bradshaw v. Millikin, 173 N.C. 434, Walker, J., adopted the English rule laid down by Chief Justice Tindell in Horner v. Graves, 7 Bing 743, that when the restraint is such, only, as will afford a fair protection to the interest of the party in favor of whom it is given, and is not so large or extensive as to interfere with the interest of the public, it will be sustained.
We may well apply to this case the words of Walker, J., in that case: "Without discussing the reasons upon which the rule is based, or endeavoring to fix a limit beyond which the parties may contract, it is sufficient to say that the terms of the present agreement are well within the principle under which such contracts are held to be valid. 9 Cyc. 525-533; Faust v. Rohr, 166 N.C. 187"; and in that same decision, page 434, he disposes of the objection raised by the defendant in this case against the provision for liquidated damages. We need not more fully discuss it, as it does not directly arise in this appeal, but the (284) rule is stated which has been laid down in all the cases that an agreement for liquidated damages will be held valid "in the absence of any evidence to show that the amount of damages claimed is unjust or oppressive, or that the amount claimed is disproportionate to the damages that would result from the breach or breaches of the several covenants of agreement." And it is further said in that case by Walker, J., (p. 436): "The mere insertion in the contract of a clause describing the sum to be recovered for a breach as liquidated damages, but which were not intended to be payable in return for the privilege of doing the acts forbidden by the contract, will not exclude the equitable remedy and is regarded as put there for the purpose of settling the damages if there should be a suit for recovery for breach." There may also be an action in the nature of a bill in equity, for what substantially would be a specific enforcement of the contract and restraining any further violation of it. *Page 299 
 Shute v. Shute, 176 N.C. 462, in nowise militates against what is said in this case. That was not an association authorized by statute for the purpose of enabling producers to protect themselves against combinations to depress the price of their products, but was an agreement between cotton gin owners to divide the territory from which their patronage would come so as to prevent competition. In that case it is stated (at p. 464): "This was clearly against public interest, which is that these ginning plants shall be multiplied according to the need of the public, and shall not be restricted in number by an agreement between the parties in that line of business." It is clear that that decision in nowise conflicts with the principle sustained in this, that producers, under regulations prescribed by statute, which are presumed on their face to be valid, can organize for the purpose of marketing their crops in such a manner as to procure a fair price for the same and to protect themselves against loss by being forced to dump them on the market in such a manner that the prices are really fixed by a buyers trust.
Naturally the cooperative movement among the farmers has aroused the opposition of the financial combinations from whose unlimited power in fixing prices the farmers are seeking to free themselves, and also among some of the owners of the public warehouses, who are more or less allied with the buyers, see Gray v. Warehouse Co., 181 N.C. 166. Besides, the establishment of their own warehouses by the cooperative associations will curtail the profits of the public warehouse business.
The same contentions presented in this case have been also argued at this term in four other cases, more or less fully, to wit: The same plaintiff as herein v. Z. A. Harrell, from Edgecombe, appeal from Daniels, J., and v. Maynard Mangum, from Wake, appeal from Lyon, J.; the same plaintiff v. W. J. Ball, from Wake, (285) appeal from the same judge; and Peanut Growers Association v. C. T.Harrell, from Bertie, appeal from Kerr, J. (See cases filed without written opinion.) In these four cases substantially the same points were presented, and in each of them the judge below reached the same conclusion, and judgment will be entered in all five cases affirming the action of the court below.
Affirmed.
Cited: Tobacco Growers v. Chilton, 190 N.C. 603; Cotton Growers Assoc.v. Bullock, 191 N.C. 466; Kadis v. Britt, 224 N.C. 161; Paper Co. v.McAllister, 253 N.C. 534. *Page 300