BAILEY v. FLUE-CURED TOBACCO COOP. STABILIZATION CORP.

[158 N.C. App. 449 (2003)]

MALCOLM L. BAILEY, INDIVIDUALLY AND MALCOLM L. BAILEY D/B/A VIRGINIA
CAROLINA TOBACCO WAREHOUSE, INC.; BIG THREE WAREHOUSE, INC., A
VIRGINIA CORPORATION; SOUTH GA. GOLDEN LEAF, INC., A GEORGIA CORPORATION;
CAROLINA WAREHOUSE, INC., A SOUTH CAROLINA CORPORATION; CAROLINA
TOBACCO WAREHOUSE, INC., A SOUTH CAROLINA CORPORATION; CENTER
TOBACCO WAREHOUSE, INCORPORATED, A NORTH CAROLINA CORPORATION;
DRAKE JOYCE; LYNCH'S TOBACCO WAREHOUSE, INC., A SOUTH CAROLINA COR-
PORATION; NEW DUPLIN TOBACCO WAREHOUSE, INC., A NORTH CAROLINA CORPO-
RATION; NEW INDEPENDENT WAREHOUSES, LIMITED PARTNERSHIP, A NORTH
CAROLINA LIMITED PARTNERSHIP; PEPPER'S WAREHOUSE, INC., A NORTH CAROLINA
CORPORATION; PLANTERS WAREHOUSE, A VIRGINIA PARTNERSHIP; PLANTERS
WAREHOUSE OF ROXBORO, INC., A NORTH CAROLINA CORPORATION; STAR-NEW
HOME TOBACCO WAREHOUSE, INC., A SOUTH CAROLINA CORPORATION; AND W.W.
(BILLY) YEARGIN, III, INDIVIDUALLY AND W.W. BILLY YEARGIN, III D/B/A YEARGIN
TOBACCO WAREHOUSE, PLAINTIFFS V. FLUE-CURED TOBACCO COOPERATIVE
STABILIZATION CORPORATION, A NORTH CAROLINA CORPORATION; BRUCE L.
FLYE, PRESIDENT IN HIS OFFICIAL CAPACITY; LIONEL S. EDWARDS, GENERAL MANAGER
AND SECRETARY IN HIS OFFICIAL CAPACITY; TRI-COUNTY TOBACCO WAREHOUSE,
INC., A GEORGIA CORPORATION; JAMIE A. BRANNEN D/B/A BRANNEN'S TOBACCO;
PLANTERS AND GROWERS GOLDEN LEAF WAREHOUSE, INC., A SOUTH
CAROLINA CORPORATION; JOHNNY SHELLEY D/B/A BIG L WAREHOUSE; JOEY
HARDIN D/B/A PEOPLES WAREHOUSE; SAMPSON TOBACCO WAREHOUSE,
INC., A NORTH CAROLINA CORPORATION; JOE PARKER D/B/A KINSTON MARKETING
CENTER; ROGER'S WAREHOUSE, INC., A NORTH CAROLINA CORPORATION;
LIBERTY TOBACCO WAREHOUSE, INC., A NORTH CAROLINA CORPORATION;
KENNETH KELLY D/B/A LIBERTY WAREHOUSE; ROBERT BROADWAY D/B/A
LIBERTY WAREHOUSE; WILLIAM EDWARD STEPHENSON D/B/A BRIGHTLEAF-
RIVERSIDE; GRANVILLE WAREHOUSE, INC., A NORTH CAROLINA CORPORATION;
OLD BELT FARMERS COOPERATIVE, INC., A NORTH CAROLINA CORPORATION;
MOTLEY'S TOBACCO WAREHOUSE, INC., A VIRGINIA CORPORATION; EXCHANGE
WAREHOUSE, INC., A VIRGINIA CORPORATION, DEFENDANTS

No. COA02-1026

(Filed 17 June 2003)

## 1. Monopolies and Restraints of Trade— market centers subsidizing tobacco warehouses—anti-trust laws

The trial court did not err in an action for injunctive relief
claiming defendant nonprofit marketing association was engaged
in unlawful actions in restraint of trade by denying plaintiff
tobacco warehouses' motion for summary judgment and by
granting summary judgment in favor of defendant even though
plaintiffs contend defendant's creation of market centers subsi-
dizing tobacco warehouse operations is not exempt under North
Carolina's anti-trust laws, because: (1) the agreement to waive
fees and commissions normally associated with tobacco ware-
houses was solely between defendant and its members and fell

within the exemption under N.C.G.S. § 54-141 for agreements between the association and its members; (2) N.C.G.S. § 54-151(1) provides that defendant is authorized to engage in any activity, including financing, related to the marketing, selling, storing, and handling of any agricultural product produced or delivered to it by its members; (3) N.C.G.S. § 54-151(6) provides that defendant is empowered to hold such ownership rights in real property as may be necessary or convenient for the conducting and operation of any of the business of the association; and (4) N.C.G.S. § 54-152 grants defendant the power to require its members to sell their products exclusively at board-created warehouses, and therefore, defendant can create commission-free market centers at which its members have the option of selling their products.

**2. Constitutional Law— North Carolina—law of the land clause—monopolies**

The trial court did not err in an action for injunctive relief claiming defendant nonprofit marketing association was engaged in unlawful actions in restraint of trade by denying plaintiff tobacco warehouses' motion for summary judgment and by granting summary judgment in favor of defendant even though plaintiffs contend defendant's actions violate Article I, Sections 19 (law of the land clause), 32 (exclusive emoluments), and 34 (monopolies) of the North Carolina Constitution, because: (1) the trial court did not address Section 32 in its order and opinion, and there is nothing in the record indicating this particular constitutional issue was raised below; and (2) the claims under Sections 19 and 34 fail since the prohibition against deprivation of property does not extend to actions against private individuals but must instead concern state actors, and defendant is not a state actor.

Appeal by plaintiffs from order and opinion dated 10 April 2002 by Judge Ben F. Tennille in Wilson County Superior Court. Heard in the Court of Appeals 23 April 2003.

*Allen and Pinnix, P.A., by Michael L. Weisel and M. Jackson Nichols; and Penry Riemann PLLC, by J. Anthony Penry, for plaintiff appellants.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by C. Ernest Simons, Jr., Donald H. Tucker, Jr., and Jackson W. Moore, for defendant appellees.*

BRYANT, Judge.

Malcolm L. Bailey, individually and doing business as Virginia Carolina Tobacco Warehouse, Inc., and several other tobacco warehouses (collectively plaintiffs) appeal an order and opinion dated 10 April 2002 denying their motion for summary judgment and request for a permanent injunction and granting summary judgment in favor of Flue-Cured Tobacco Cooperative Stabilization Corporation (Stabilization).[1]

Plaintiffs brought an action for injunctive relief claiming Stabilization was engaged in unlawful actions in restraint of trade. The facts as presented in the trial court's April 10 order are undisputed:

{6} [Stabilization] is a not-for-profit organization that is owned by and serves the flue-cured tobacco farmers of Florida, Alabama, Georgia, South Carolina, North Carolina and Virginia. Stabilization is organized as a "marketing association" under North Carolina General Statutes, Chapter 54, Article 19. Its mandate under this enabling statute . . . is broad . . . .

{7} Since its inception in 1946, Stabilization's primary function has been to administer the price component of the federal tobacco program under contractual agreement with the United States Department of Agriculture's (USDA) Commodity Credit Corporation (CCC). The program was established under the Agricultural Adjustment Act of 1938 as a means to raise and stabilize tobacco prices and income. . . .

{8} Under the agreement with the CCC and auction warehouses, Stabilization makes loans to eligible flue-cured tobacco growers whose tobacco has been grown within the allotted quota and does not bring the minimum price established for that grade at the auction market. Funds to advance loans to farmers are borrowed from the CCC. The farmers' tobacco that is consigned to Stabilization is pledged as collateral to CCC for the money borrowed.

{9} In order to administer the price support program, the USDA requires that all tobacco that Stabilization acquires through the program be graded at auction. . . . Without the grade, a price level

---

1. Following the trial court's April 10 order, plaintiffs filed a notice of voluntary dismissal without prejudice as to the warehouse defendants listed in the caption.

cannot be determined, and farmers therefore are not able to take advantage of the program.

{10} The price supports made possible by the federal tobacco program provide a "safety net" for growers . . . . By ensuring farmers a minimum price for their crop every year, farmers can plan, borrow and invest in their farms, thus permitting thousands of individual farmers to pursue their livelihoods with a degree of security that would otherwise not be available.

{11} For most of the past century, the primary method tobacco farmers used to sell their crops was through one of many auction warehouses located throughout the region. Recently, however, the auction warehouse system has been facing a severe challenge. Rather than designating their crop for sale at auction, many farmers are choosing to sell their crop under contract directly to buyers, such as large tobacco companies. The reason is straightforward: Over the past two years, the price that Stabilization's cooperative members have received for tobacco sold through the auction warehouse system is approximately nine to ten cents per pound less than they would have received if they sold the same tobacco under contract outside the auction system. This price differential subsumes two components: First, the average price per pound of tobacco is approximately five cents per pound higher than that received on the auction floor. Second, the farmers must pay the warehouse operators fees and commissions that reduce the net price the farmers receive at auction by approximately five cents per pound.

{12} These higher prices available to farmers who are willing to contract directly with the buyers has impacted the traditional auction system dramatically. From 2000 to 2001[,] the percentage of tobacco production sold under contract to the tobacco companies increased from 10 percent to over 80 percent. . . . Over the same period, the total number of independent warehouses in Stabilization's geographic area decreased from 147 to 67. . . .

{13} Overall, if these grower selling patterns continue to favor direct contract sales rather than auction sales, the existence of the auction system may be threatened, and, accordingly, the continuation of the federal tobacco program price supports would also be jeopardized.

{14} Throughout most of its existence, Stabilization has had little or no involvement with the operation of tobacco warehouses. In

2001, however, Stabilization established a pilot program involving two warehouses, located in Wilson, North Carolina, and Statesboro, Georgia, that it would operate. According to Stabilization, the purpose of this program was to see whether Stabilization could encourage a sufficient number of its members to stay with the auction system if Stabilization took the auction "in house" for the benefit of its members. For the 2002 season, Stabilization's board of directors considered and approved a program to open fourteen new "marketing centers" in Stabilization's territory. In an effort to make these centers an economically viable option for growers who felt financial pressure to sell their crop directly under contract, Stabilization's board agreed to waive the fees and commissions normally charged by warehouse operators. In effect[,] the Stabilization Board decided to use its cash reserve to subsidize the operation of the market centers. That subsidy directly benefit[t]ed its members, who did not have to pay fees and commissions if they used the market centers.

{15} Warehouses chosen as marketing centers would be leased for five months out of the year and would not be purchased by Stabilization. The lease agreements give the lessors no rights with respect to the operation of the marketing centers. Additionally, the lessors have no involvement in the decision to charge or waive fees, and they do not participate in the profits or losses of the marketing centers. Stabilization has no obligation to renew the lease beyond the current marketing season.

{16} In accordance with its agreement with the CCC, Stabilization submitted its plan for the marketing centers to the CCC. The USDA's Office of General Counsel reviewed and approved the plan.

In addressing the question whether Stabilization's activity violated North Carolina's antitrust laws, the trial court reviewed N.C. Gen. Stat. §§ 54-141, -151, and -152(a) and concluded that the creation of no-fee market centers for the benefit of Stabilization's members was exempt from the antitrust laws. The trial court further concluded that Stabilization's actions did not violate Article I, Sections 19 and 34 of the North Carolina Constitution. Finally, the trial court noted that:

[Plaintiffs] believe that the tobacco farmers have only two choices. They can sell on contract directly to the manufacturers or, if they wish to protect themselves from the tobacco manufac-

turers, they can sell at auction in public warehouses where they must pay commissions and fees. The [trial] court believes that they have a third option of using their own funds to provide auction services to themselves for free. The goals of the market center program are to insure the survival of the auction market and the federal price support system upon which so many small farmers depend. The Stabilization Board may contract with third parties to accomplish those goals.

The issues are whether: (I) Stabilization's creation of market centers subsidizing warehouse operations falls within the exemption under N.C. Gen. Stat. § 54-141 to North Carolina's antitrust laws and (II) plaintiffs can challenge the constitutionality of Stabilization's actions under Article I, Sections 19 and 34 of the North Carolina Constitution.

I

**[1]** Plaintiffs contend that Stabilization's creation of market centers subsidizing warehouse operations is an action in restraint of trade that is not exempt under section 54-141. We disagree.

Section 54-141 provides:

No association organized [under chapter 54, article 19 of the Cooperative Organizations Act] shall be deemed to be a combination in restraint of trade or an illegal monopoly; or an attempt to lessen competition or fix prices arbitrarily, nor shall the marketing contracts or agreements between the association and its members, or any agreements authorized in this Subchapter be considered illegal or in restraint of trade.

N.C.G.S. § 54-141 (2001). In this case, Stabilization leased warehouse space without assigning any operational rights to the lessors. The agreement to waive fees and commissions normally associated with tobacco warehouses is thus solely between Stabilization and its members and consequently falls within the exemption for "agreements between the association and its members." *Id.* Furthermore, pursuant to N.C. Gen. Stat. § 54-151:

Each association incorporated under this Subchapter shall have the following powers:

(1) *To engage in any activity in connection with the* producing, *marketing, selling,* . . . storing, handling, or utiliza-

tion *of any agricultural products produced or delivered to it by its members* and other farmers; . . . ; or in the *financing* of any such activities; or in any one or more of the activities specified in this section. . . .

. . . .

(6) To buy, *hold, and exercise all privileges of ownership, over such real or personal property as may be necessary or convenient for the conducting and operation of any of the business of the association,* or incidental thereto.

(7) *To do each and everything necessary, suitable, or proper for the accomplishment of any one of the purposes or the attainment of any one or more of the objects herein enumerated;* or conducive to or expedient for the interest or benefit of the association; *and to contract accordingly* . . . .

N.C.G.S. § 54-151 (2001) (emphasis added). Therefore, Stabilization is authorized to engage in any activity, including financing, related to the marketing, selling, storing, and handling of any agricultural product "produced *or* delivered to it by its members." N.C.G.S. § 54-151(1) (2001) (emphasis added). In addition, Stabilization is empowered to hold such ownership rights in real property as "may be necessary or convenient for the conducting and operation of any of the business of the association." N.C.G.S. § 54-151(6) (2001). In light of these specific powers and the catch-all provision of subsection (7), we conclude that Stabilization's creation and operation of the market centers also falls within the exemption for "agreements authorized in this Subchapter." N.C.G.S. § 54-141.

We further note that the trial court found additional authority under N.C. Gen. Stat. § 54-152 for the provision of commission-free warehouses. This section authorizes "[t]he association and its members [to] make and execute marketing contracts, requiring the members to sell . . . all or any specified part of their agricultural products or specified commodities exclusively to or through the association or any facilities to be created by the association." N.C.G.S. § 54-152(a) (2001). Such marketing contracts were upheld as constitutional in *Cooperative Ass'n v. Jones*, 185 N.C. 266, 117 S.E. 174 (1923). The trial court reasoned, and we agree, that since the section grants Stabilization the power to require its members to sell their products exclusively at board-created warehouses, it can certainly create commission-free market centers at which its members have the option of

selling their products. As such, there was ample statutory authority supporting the trial court's conclusion that Stabilization's actions in this case are exempt from North Carolina's antitrust laws.

II

[2] In their brief to this Court, plaintiffs further argue that Stabilization's actions violate Article I, Sections 19 (law of the land clause), 32 (exclusive emoluments), and 34 (monopolies) of the North Carolina Constitution. We first note that the trial court did not address section 32 in its order and opinion, and there is nothing in the record indicating this particular constitutional issue was raised below. Consequently, we do not address the applicability of section 32 to this case. *See State v. Cooke*, 306 N.C. 132, 137, 291 S.E.2d 618, 621 (1982) (citation omitted) (" 'a constitutional question which is not raised and passed upon in the trial court will not ordinarily be considered on appeal' ").

The trial court did rule that plaintiffs were not deprived of any property rights in violation of section 19 and that Stabilization's actions did not violate the prohibition against monopolies in section 34. According to section 19, "[n]o person shall be . . . in any manner deprived of his life, liberty, or property, but by the law of the land." N.C. Const. art. I, § 19. It is clear from this language that the prohibition against deprivation of property does not extend to actions against private individuals but must instead concern State actors. As our Supreme Court has held, "[t]he civil rights guaranteed by the Declaration of Rights in Article I of our Constitution are individual and personal rights entitled to protection against state action." *Corum v. University of North Carolina*, 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992). Conversely, "the Constitution itself does not recognize or create rights which may be asserted against individuals." *Id.* at 787, 413 S.E.2d at 292-93; *see also Johnson v. Mayo Yarns, Inc.*, 126 N.C. App. 292, 298, 484 S.E.2d 840, 844 (1997) (Greene, J., concurring) ("the United States Constitution . . . does not secure rights to individuals against other individuals"). Although, in their brief to this Court, plaintiffs point to case law to support their position that "[u]nlike most constitutional provisions, [section 34 prohibiting monopolies] applies to litigation even in the absence of a State actor," the cited authority does not stand for this proposition. *See In re Hospital*, 282 N.C. 542, 193 S.E.2d 729 (1973) (involving the actions of a State licensing commission); *Records v. Tape Corp.*, 19 N.C. App. 207, 212, 198 S.E.2d 452, 456 (1973) (where, in a suit between private parties, constitutional argument was raised as a defense, but this

Court did not engage in a constitutional analysis). As Stabilization is not a State actor, we conclude that both plaintiffs' section 19 and 34 claims fail. Accordingly, the trial court did not err in denying plaintiffs' motion for summary judgment and in granting summary judgment in favor of Stabilization.

Affirmed.

Judges TIMMONS-GOODSON and GEER concur.