STATE OF TENNESSEE ex rel, ATTORNEY-GENERAL v. BUR-
LEY TOBACCO GROWERS' CO-OPERATIVE ASSOCIATION.

Eastern Section. July 24, 1926.

Certiorari denied by Supreme Court, January 15, 1927.

1. **Monopolies. Corporation organized under Bingham Co-operative Marketing Act (Ky. Acts 1922, ch. 1), held not violative of federal or state anti-trust laws.**
In an action to prevent the Burley Tobacco Growers Co-operative Association, organized under Bingham Co-operative Marketing Act (Ky. Acts 1922, ch. 1), doing business in Tennessee, held that an examination of the charter of the corporation shows that its purposes are consistent with those of the Statutes of Tennessee. (Tenn. Co-operative Marketing Act 1923.)

2. **Monopolies. Association must commit unlawful acts before action for ouster will lie and it will not be ousted because it may be expected to commit unlawful acts.**
So long as an Association commits no act detrimental to the public welfare it is a lawful organization and its contracts are not subject to attack. The Federal Anti-Trust Statute is directed against monopoly and not against expectations of it.

3. **Monopolies. Mere size and power of co-operative association does not render it an unlawful combination or trust.**
That cooperative marketing association is large and powerful and may sometime be guilty of coercion or suppression of competitors, arbitrary fixing and maintenance of prices, or other acts making combination illegal, does not render it an unlawful combination or trust.

4. **Monopolies. Monopoly defined.**
An organization or combination that is guilty of coercion and suppression of competitors, unfair or fraudulent rivalry, arbitrarily fixing and maintaining prices, limiting production and creating an artificial scarcity, impairment of quality or decreasing wages or prices of materials is an illegal combination.

5. **Contracts. Contracts in restraint of trade are not illegal except when unreasonable in character.**
Contracts in restraint of trade are not illegal except when unreasonable. When the restraint of trade is such only as will afford a fair protection to the interest of the party in favor of whom it is given, and is not so large or extensive as to interfere with the interest of the public, it will be sustained.

6. **Quo Warranto. In actions of quo warranto or ouster the test is not what the intent of the party or combination may be, but what it has done, or what is its probable effect.**
Individuals aggrieved by threatened acts of an association may invoke an injunctive process to restrain such acts, or the state under section 3188 of the Code might act in the capacity of a guardian for the public in invoking such process, but the courts in actions of quo warranto or ouster generally hold that at last the test, and the only test, is not what the intent of the party may be, nor what form the combination has taken, but what will be the probable effect of the combination. It is this question of the probable effect rather than the actual intent that is the test under which the injunctive process may or may not be issued.

7. **Monopolies. Burley Tobacco Growers Co-operative Association held not to be a monopoly.**
   In an action to oust the Burley Tobacco Growers Co-operative Association from the State of Tennessee on the ground that it was a monopoly limiting production and eliminating competition held that upon the face of the charter, by-laws and marketing agreements of the association it was not illegally monopolistic. It is in effect a selling agency with the middle man eliminated. A mere selling agency is not a monopoly and neither the common law nor the Anti-trust statute applies to a genuine sales agency.

8. **Monopolies. Burley Tobacco Growers Co-operative Association found not guilty of acts constituting a monopoly.**
   Upon an examination of the evidence held that the effect of the work of the association was not to raise the price of tobacco to the consumer; that it had not been the effect of the operation of the association to intimidate tobacco growers into joining the association; that there had been no acts upon the part of the association to reduce the acreage of Burley tobacco grown in Tennessee; that the effect of the operation of the association had not caused a general drop in tobacco prices.

9. **Quo Warranto. Mere showing that organization has not accounted to its members for the manner in which its monies was spent is not ground for ouster.**
   The mere showing that the Burley Tobacco Growers Co-operative Association had collected great sums of money and had much expense and that the president had refused to furnish all information when called upon, held not to be a basis for a judgment of ouster, or an injunction. Such an action does not involve or demand an accounting to the members of the association for the monies of the organization.

10. **Monopolies. The fact that the power and management of a large organization is in the hands of one man or general manager, supported by a board of directors, does not render the association illegally monopolistic.**
    Although the evidence showed that the general manager of the Burley Tobacco Growers Co-operative Association had the power to arbitrarily fix and maintain prices held that the evidence did not show the power had been unduly exercised, and there were no acts on the part of the organization to brand it as a monopoly.

11. **Agriculture. Monopolies. The fact that a non-profit sharing organization formed for the sale of farm products has right to create subsidiary organization having capital stock for acquiring and holding warehouses, factories, etc., for the care of the farm products dealt in does not render the association void as a monopoly.**
    The fact that the Burley Tobacco Growers Co-operative Association under its charter was permitted to lease, buy, and own warehouses, storerooms, factories, etc., for the purposes of taking care of the tobacco of the association and the preparation of its products for market does not render the association void as a monopoly.

12. **Quo Warranto. Misrepresentations made by agents of the organization to secure contracts when made in violation of the orders of the organization are not sufficient to justify an ouster of the organization.**
    The fact that some of the agents of the Burley Tobacco Growers Co-operative Association in violation of their instructions made false representations to farmers to secure their contract held not sufficient to justify an ouster of the corporation and prevent it doing business in Tennessee.

Appeal from Chancery Court, Knox County; Hon. Charles Hayes Brown, Chancellor.

Reversed and dismissed.

Aaron Sapiro, of Chicago; W: F. Lynch, Fred C. Houk, W. T. Kennerly, all of Knoxville, Robert H. Hayes, of Lexington Kentucky, Brown & Waldauer, of Memphis, for appellant.

Frank M. Thompson, Attorney-General, of Nashville, Lee, Price & Meek, and Smith & Carlock, all of Knoxville, for appellee.

DeWitt, J. The bill in this cause was brought by the State of Tennessee, on relation of its Attorney-General, under section 3188 of Shannon's Annotated Code, against the Burley Tobacco Growers' Co-operative Association, a corporation chartered under and by virtue of the Bingham Co-operative Marketing Act of Kentucky (Acts of Kentucky, 1922, chapter 1), for the purpose of inhibiting it from transacting its business in Tennessee upon the ground that the business in which it is engaged and which it proposes to transact, constitutes it an unlawful trust and combination, violative of the provisions of the anti-trust statutes of Tennessee, compiled in section 3185 of Shannon's Annotated Code. At the time of the filing of the bill the Chancellor granted a preliminary injunction upon ex parte application. Several motions were made to dissolve this injunction but this was denied; except that the association was permitted to perform all contracts made by it with farmers in Tennessee prior to the issuance of the injunction and to use, as incident thereto, any warehouses owned or to be built by it, to buy or rent other warehouses such as it might deem proper for storing, handling and selling tobacco purchased by it or to be received by it under contracts made by it prior to the issuance of the injunction.

Upon the hearing, upon a voluminous record, the Chancellor sustained the bill, holding that the defendant association was an unlawful combination in restraint of trade existing and operating in violation of the anti-trust statutes, and therefore, he rendered a decree perpetually enjoining said defendant from doing business in Tennessee. From this decree the association, and certain of its officers and agents, who were made co-defendants, have appealed and assigned errors.

It was charged in the bill that this association, in its purposes and methods of operation, and especially in procuring its uniform contract with growers of tobacco, and its acts and conduct under the contract, had been guilty of coercion and suppression of competitors; unfair rivalry, arbitrarily fixing and maintaining prices; limiting production and creating an artificial scarcity of a domestic and commercial article; impairment of quality; decreasing wages and price of materials. It was further charged that the said agreements and said acts of the association were made out of a purpose to lessen full and free competition in the sale of Burley tobacco, an article of domestic growth; that said agreements on their face and

in effective performance tended to increase the cost of producing Burley tobacco and increase the price thereof both to the purchaser and the consumer. In other words, the bill substantially charged that the association was committing acts detrimental to the public welfare, in hurtful and unreasonable restraint of trade.

The defendant denied all of these averments, insisting that its purpose was to stabilize markets; to prevent speculation and waste; to enable the farmer to obtain the best prices for his tobacco at the least cost and expense; denied that its agreements and acts had been and were being made and done with a purpose to lessen full and free competition in the sale of Burley tobacco or cause a tendency to increase the cost of production or the price to the consumer, or decrease the price to the grower. It denied that it had been engaged in coercion and suppression of competitors, unfair rivalry, arbitrarily fixing and maintaining prices, limiting production, creating an artificial scarcity of a domestic and commercial article, or impairment of quality and decreasing wages and price of material. It denied that it had in any manner violated the laws of the State of Tennessee. It averred that it was doing not only a legal business, but one extremely beneficial to the citizens, particularly the farmers of Tennessee, having actually invested in the State of Tennessee hundreds of thousands of dollars and proposing to invest more—all having for its ultimate effect not only profit to its members, but development of the resources and the soil of the States of Tennessee.

The defendant association was incorporated on January 11, 1922, by certain citizens of Kentucky, under the provisions of the said Bingham Co-operative Marketing Act of Kentucky. This Act is in all essential respects identical with chapter 100 of the Acts of the General Assembly of Tennessee for the year, 1923, known as the Tennessee Co-operative Marketing Act. On April 16, 1923, the association filed its charter in the office of the Secretary of the State of Tennessee and became empowered to operate in Tennessee as a foreign corporation. In July, 1923, the campaign for soliciting members was begun in Tennessee by operations in Washington county through the help of solicitors and agents. This campaign continued until August, 1924, when the injunction was issued in this cause. By that time about twenty-four hundred farmers in Tennessee had signed the uniform marketing agreement as members of the association.

In Kentucky, in which by far the largest amount of Burley tobacco is grown, the association began its activities in January, 1922. It is composed of approximately one hundred and eight thousand members, who are citizens of the states of Kentucky, Indiana, West Virginia, Missouri and Tennessee. The production of Burley tobac-

co has grown rapidly within a few years because of its superior quality, especially for use in pipes and cigarettes; the demand for it having been greatly stimulated during the World War and thereafter. The following amounts of tobacco have been delivered to the association:

| | | | |
|---|---|---|---|
| 1921 | Crop. | 119,914,613 | pounds. |
| 1922 | '' | 197,009,763 | '' |
| 1923 | '' | 245,307,781 | '' |
| 1924 | '' | 171,244,953 | '' |

In addition there has been an increasing amount of Burley tobacco year by year raised by non-members of the association and marketed on the floors of the lose-leaf warehouses. The average price of Burley tobacco prior to 1921 was about thirty-two cents per pound, but in the commercial and agricultural deflation of that time the average price fell to a little more than thirteen cents a pound.

In Liberty Warehouse Company v. Burley Tobacco Growers' Cooperative Association, 271 S. W., 698, the Court of Appeals of Kentucky said:

"We take judicial knowledge of the history of the country and of current events, and from that source we know that conditions at the time of the enactment of the Bingham Act were such that the agricultural producer was at the mercy of the speculators and others who fixed the price of the selling producer and the purchasing price of the final consumer through combinations and other arrangements, whether valid or invalid, and that by reason thereof the former obtained a grossly inadequate price for his products. So much was that the case that the intermediate handlers between the producers and the final consumer injuriously operated upon both classes and fattened and flourished at their expense. It was and is also a well known fact that without the agricultural producer, society could not exist, and the oppression brought about in the manner indicated was driving him from his farm, thereby creating a condition fully justifying an exception in his case from any provision of the common law, and likewise justifying legislative action in the exercise of its police power."

The court also said:

"It may be also stated that co-operative marketing acts for agricultural products have been enacted in a great number of the agricultural states, the provisions of which are similar to and in many instances the same as are the provisions of the Bingham Act. They are all intended to accomplish the same ultimate end, and in each of those states they have been up-

held in actions urging the same constitutional objections as are made here.''

In Potter v. Dark Tobacco Growers' Co-operative Association, 201 Ky., 441, 257 S. W. 33, the Court of Appeals of Kentucky held that said Bingham Co-operative Marketing Act was valid. In two cases the Supreme Court of Tennessee has recently held said act to be valid and stated that it was not violative of our Anti-trust Statute, chapter 140, Acts of 1903, or of the Federal Anti-trust Statute. Dark Tobacco Growers' Co-operative Association v. Mason, 150 Tenn., 228, 263 S. W., 60; Dark Tobacco Growers' Co-operative Association v. Dunn, 150 Tenn., 614, 266 S. W. 308. Chapter 140, Acts of 1903, sec. 3185, Shannon's Annotated Code, is as follows:

"All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are hereby declared to be against public policy, unlawful and void.''

In the Dunn case the court declared that so long as an association, organized under said Bingham act, commits no act detrimental to the public welfare it is a lawful organization and its conduct and its contracts with purchasers are not subject to attack. The Mason and Dunn cases were decided upon an interpretation of the Kentucky act while our anti-trust act of 1903, chapter 140, was unquestionably in full force and effect, unimpaired by any subsequent statute. The Tennessee Co-operative Marketing act, essentially identical with the Kentucky act, contains the following provision:

"Section 25—Rights and Remedies applied to similar associations of other States. Be it further enacted, that any corporation or association heretofore or hereafter organized under generally similar laws of another state, shall be allowed to carry on any proper activities, operations and functions in this state, upon compliance with the general regulations applicable to foreign corporations desiring to do business in this state and all contracts which could be made by any association incorporated hereunder, made by or with such associations, shall be legal and valid and enforcible in this state with all of the remedies set forth in this act.''

It is insisted for the relator that the purposes and acts of the defendant association must be judged strictly according to the Act

of 1903, the common law, and the rules laid down by our Supreme Court in the interpretation and application of the anti-trust acts, both federal and state.

In the application of the anti-trust laws, in the more recent cases, by the Supreme Court of the United States, the interpretative declarations of the earlier cases (United States v. Trans-Missouri Freight Association, 166 U. S., 290, 41 L. Ed., 1007; United States v. Joint Traffic Association, 171 U. S., 505, 43 L. Ed., 259) to the effect that any restraint upon interstate commerce would constitute a violation, have been essentially modified.

In Standard Oil Co. v. United States, 221 U. S., 1, 31 S. Ct. 503, 55 L. Ed., 619, 34 L. R. A. (N. S.), 734, Ann. Cas., 1912 D. 734, and United States v. American Tobacco. Co., 221 U. S., 106, 31 S. Ct., 532, 55 L. Ed., 663, that court laid down the following doctrine:

"Only undue restraints of interstate or foreign trade or commerce are prohibited by the provisions of the act of July 2, 1890, —1, 2, declaring illegal every contract, combination in the form of trust or otherwise, or conspiracy in restraint of such trade or commerce, and making guilty of a misdemeanor every person who shall monopolize or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of such trade or commerce.

"The standard of reason which had theretofore been applied at the common law and in the United States in dealing with subjects of the character embraced by the prohibitions of the act of July 2, 1890 — 1, 2, against combinations in restraint of interests or foreign trade or commerce or monopolization or attempts to monopolize any part" of such trade or commerce, "was intended to be the measure used for the purpose of determining whether, in a given case, a particular act had, or had not, brought about the wrong against which the statute provided."

Those cases were decided on May 15th, and May 29, 1911, respectively.

On March 1, 1920, the United States Supreme Court decided the case of United States v. U. S. Steel Corporation, 251 U. S., 417, 40 S. Ct., 293, 64 L. Ed., 343, 8 A. L. R., 1121. In that case the court declared a still more liberal doctrine in which six judges concurred, as follows:

"A holding corporation which by its formation united under one control competing companies in the steel industry, but which did not achieve monoply, and only attempted to fix prices through occasional appeals to and confederation with competitors, whatever there was of wrongful intent not having been executed, and whatever there was of evil effect having been

discontinued before suit was brought, should not be dissolved nor be separated from some of its subsidiaries at the suit of the government, asserting violation of the Sherman Anti-Trust Act, especially where the court cannot see that the public interest will be served by yielding to the government's demand, and does see in so yielding a risk of injury to the public interest, including a material disturbance of, and, perhaps, serious detriment to, the foreign trade.''

This ''rule of reason,'' in the interpretation of the Act of 1903 was adopted by our Supreme Court in Baird v. Smith, 128 Tenn., 410. It was approved by that court in Dark Tobacco Growers' Cooperative Association v. Dunn, supra, in which the court said:

''In Mar-Hof Co. v. Rosenbacker, 176 N. C., 330, 97 S. E., 169, the whole subject is admirably discussed by Mr. Justice Hoke, in which he states that originally at common law all agreements in restraint of trade were held void as being against public policy. This, however, he says has been more and more modified by the decision of the courts, until it has come to be a generally accepted principle that agreements in partial restraint of trade would be upheld, when they are founded on valuable considerations, are reasonable and necessary to protect the interests of the party in whose favor they are imposed, and do not unduly prejudice the public interest—quoting Clark on Contracts. This same doctrine has been sustained in Bradshaw v. Millikin, 173 N. C., 432, 92 S. E., 161, L. R. A., 1917E, 880. In two notable instances, Standard Oil Co. v. United States, 221 U. S., 1, 31 S. Ct., 502, 55 L. Ed., 619, 34 L. R. A. (N. S.), 834, Ann. Cas., 1912D, 734, and United States v. American Tobacco Co., 221 U. S., 106, 31 S. Ct., 632, 5 L. Ed., 663, stipulations in partial restraint of trade were held not to be obnoxious to the law, unless they were unreasonable and likely to become monopolies which are obnoxious to our constitutional provisions. Const. N. C., art. 1, sec. 31, which provides that 'monopolies are contrary to the genius of a free state, and ought not to be allowed.' An examination of this statute shows, we think, that this Association is authorized for the purpose, not of creating a monopoly, but to protect the tobacco producers against oppression by a combination of those who buy, and not to authorize, and does not empower those who produce the raw materials to create a monopoly in themselves.''

As showing the change in public opinion and public policy of the United States Government in treating farmers as a distinct class with reference to their economic problems, reference need only be made to the Clayton Act, sec. 6, (U. S. Comp. St., sec. 8835F), in which Farmers' Co-operative Marketing Associations are expressly

exempted from the operation of the Federal Anti-Trust Statutes; the Capper-Volstead Act of 1922, in which farmers are permitted to form organizations either with or without capital stock for the purpose of marketing, provided the associations conform to certain requirements. These requirements are designed to prevent monoplization or restraint of trade in interstate or foreign commerce to such an extent that the price of any agricultural product is unduly enhanced thereby.

In the report of the Secretary of Agriculture for the year, 1923 (Year Book of the Department of Agriculture, 1923, page 12), in setting forth the causes for improvement in the condition of the farmer, the Secretary, among other things, said:

"Co-operative marketing associations have been given protection from unjust prosecution and encouraged to function freely, with the view of enabling their members to reduce marketing costs and market their crops in an orderly manner."

In Potter v. Dark Tobacco Growers' Co-operative Association, supra, the Kentucky Court of Appeals said:

"The enactment by the Legislatures of thirty or more of the states of enabling acts precisely like the Bingham Co-operative Marketing Act is further evidence of the present state of public opinion on the matter, as is the attitude of every other agency through which an enlightened public policy may be declared, including the more recent resume of the state of the Union by the President of the United States. The basis of this change in public opinion toward combination and classification is not in any sense political but economic rather, and in our judgment it is because of basic economic conditions affecting vitally not only the farmer, but also the public weal, that the classification based upon agricultural pursuits is reasonable, just and imperative for the good of the entire nation and every citizen thereof."—Citing many cases.

That the Tennessee Co-operative Marketing Act of 1923, nearly identical with the Kentucky Act, is in line with this modern spirit of great regard for the farmer's peculiar economic problems, and the rule of reason, is evidenced not only by the provisions of the act but also by the opinions of the Supreme Court of Tennessee in the Mason and Dunn cases showing a liberal view, applying the Bingham Act of Kentucky. The Act of 1923 is a declaration of the public policy of the state which must be interpreted according to its terms. The purposes of the Act are declared in section 1 (2), as follows:

"In order to promote, foster and encourage the intelligent and orderly marketing of agricultural products of the soil through co-operation; and to eliminate speculation and waste,

and to make the distribution of agricultural products between purchaser and consumer as direct as can be efficiently done, and to stabilize the marketing of agricultural products and to provide for the organization and incorporation of Co-operative Marketing Associations for the marketing of such products this Act is passed."

The act provides for the incorporation and organization of associations with or without capital stock; each member to have one vote upon the payment of a membership fee. The corporation is to be managed by a board of directors chosen by the members. The principal powers conferred upon such corporation are as follows:

Section 6— (2):

To engage in any activity in connection with the marketing, selling, preserving, harvesting, drying, processing, manufacturing, canning, packing, grading, storing, handling, or utilization of any agricultural products produced or delivered to it by its members, or the manufacturing or marketing of the by-products thereof; or any activity in connection with the purchase, hiring, or use by its members of supplies, machinery or equipment; or in the financing of any such activities; or in any one or more of the activities specified in this section. No association, however, shall handle the agricultural products of any non-member, except for storage."

Section 18:

"Be it further enacted, That the Association and its members may make and execute marketing contracts, requiring the members to sell, for any period of time, not over ten years, all or any specified part of their agricultural products or specified commodities exclusively to or through the association, or any facilities to be created by the association. If they contract a sale to the association, it shall be conclusively held that title to the products passes absolutely and unreservedly except for recorded and statutory liens, to the association upon delivery. The contract may provide, among other things, that the association may sell or re-sell the products delivered by its members, with or without taking title thereto; and pay over to its members the re-sale price, after deducting all necessary selling, overhead and other costs and expenses, including interest or dividends on stock, not exceeding eight (8) per cent per annum, and reserves for retiring the stock, if any other property reserves; and, or any other deductions."

The public policy of the state of Tennessee as to such an organization is declared in section 27, of said Act, which is as follows:

"Be it further enacted, That no association organized hereunder and complying with the terms hereof, shall be deemed

to be a conspiracy or a combination in restraint of trade or an illegal monopoly; or an attempt to lessen competition or to fix prices arbitrarily nor shall the marketing contracts and agreements, between the association and its members or any agreements authorized in this Act, be considered illegal as such or an unlawful restraint of trade or as part of a conspiracy or combination to accomplish an improper or illegal purpose.''

In view of these provisions, as included in the Bingham Act of Kentucky, and especially in view of the interpretation and application of them, as set forth in the opinions of the Supreme Court in the Mason and Dunn cases, we are unable to concur in the view that as to associations organized and operated for the co-operative marketing of agricultural products, our previous anti-trust laws have been left unchanged. The Tennessee Co-operative Marketing Act of 1923 would seem to legalize practices which might have been questioned prior to the enactment thereof. This act was declared in the Dunn case to be an expression of the policy of the state, especially in section 5, of said Act. It was shown in the Dunn case that the validity of such Acts has been sustained by every court passing upon it—citing many cases. 150 Tenn., 622. The method of group marketing or co-operation as an economic expedient for the farmer was declared to be lawful, as it was an economic necessity. An examination of the charter of incorporation of the defendant, Burley Tobacco Growers' Association, shows that its purposes are consistent with those of the Statute of Tennessee. A contract essentially identical with its uniform contract with the growers was declared in the Mason and Duncan cases to be valid and enforceable. So long as the association commits no act detrimental to the public welfare it is a lawful organization and its contracts with producers are not subject to attack. In the Dunn case it was held that the Federal Anti-Trust Statute is directed against monopoly and not against expectation of it. The court applied to the association in question in that case, the Dark Tobacco Growers' Co-operative Association, the presumption that the parties, by entering the combination and by execution of the contracts, intended only to enter into such engagements as were lawful, and that such contract should in the absence of allegations and proof to the contrary, be construed as limited to lawful purposes under the statutes and the constitution. Tobacco Growers' Co-operative Association v. Jones, 185 N. C., 265, 117 S. E., 174; Burley Tobacco Co. v. Gillaspy, 51 Ind. App., 583, 100 N. E., 93.

In the Mason case our Supreme Court held that the fact that a co-operative marketing association is large and powerful, and may sometime be guilty of coercion or suppression of competitors, arbitrarily maintaining and fixing prices, or other acts making the

combination illegal, does not render it an unlawful combination or trust.  150 Tenn., 228.

The court quoted from United States v. Keystone Watch Co., 218 Fed., 502, the list of acts which make a combination illegal.  These acts are:  coercion or suppression of competitors; unfair or fraudulent rivalry; arbitrarily fixing and maintaining prices; limiting production or creating an artificial scarcity; impairment of quality; and decreasing wages and price of materials.

Our Supreme Court in commenting upon these acts with reference to the complainant in that case, said:

"Complainant is not shown to have been guilty of any of these acts.  The mere fact that the complainant is large and powerful and may in the future be guilty of some one or more of these acts, does not render it an unlawful combination or trust."

The inference is that there must be undue practice of such acts to make the organization unlawful.  When the restraint of trade is such only as will afford a fair protection to the interest of the party in favor of whom it is given, and is not so large or extensive as to interfere with the interest of the public, it will be sustained.  Bradshaw v. Millikin, 173 N. C., 432, L. R. A., 1917 E. 880, 92 S. E., 161.

It is insisted for the state that in this proceeding the court should inquire into the purpose or intent of the organizers of the association, and if that purpose be detrimental, it would be ground for sustaining the bill.  From the opinions of the Supreme Court of Tennessee in the Dunn and Mason cases, and the opinion of the Court of Appeals of Kentucky in the Liberty Warehouse Co. case, supra, the general principle is to be deduced that the intent of the organizers, officers or stockholders is immaterial upon a question of restraint of trade; that the court only looks toward economic results actually accomplished and not to states of mind.  It is insisted that such a construction of the law is odious and intolerable, incompatible, with our Constitution, and not only contrary to the spirit and policy of our Constitution, but contrary to and destructive of, common right; that it would not only render easy, but would invite, the violation of the law.  If it appeared that the corporation was threatening to do things detrimental to many individuals as well as to the general public, the injunctive process of the court might be invoked under the statute, in order to prevent a multiplicity of suits.  But the number of members dissatisfied, as shown by the record, in this cause, is so small in proportion to the total number, that we see no reason for the application of this remedy upon such ground.  These members are not parties to this suit.  As was said by the Supreme Court of Pennsylvania in Com., ex rel. v. Pitts and Connorsville Railroad Co., 58 Pa. St., 45:

"The design clearly evinced to do an unlawful act may justi-
fy the interposition of a court of equity by the process of in-
junction, but it would be unjust before the act was consum-
mated to visit the corporate body itself with the extreme pen-
alty of civil death and confiscation."

In other words, individuals aggrieved by threatened acts of the
association might invoke the injunctive process to restrain such acts,
or the state, under section 3188 of the Code, might act in the capac-
ity of a guardian for the public and invoke such process. Neverthe-
less, it does appear that the courts in actions of quo warranto or
custer, generally hold that at last the test, and the only test, is not
what the intent of the parties may be, nor what form the combina-
tion has taken, but what will be the probable effect of the combina-
tion. It is this question of the probable effect rather than the actual
intent that is the test under which the injunctive process may or
may not be used. See, Yazoo & Mississippi Valley Railroad v.
Searles, 85 Miss., 52, 37 L. R. A., 715; Camor-McConnell Co. v. Mc-
Connell, 13 Fed., 412; Diamond Match Co. v. Raber, 106 N. C., 473;
Fletcher's Cyc. of Corp., 5520.

We will discuss the facts of this case with reference to the prob-
able effect of the operations of the association instead of the mere
intent with which they were to be carried on. But, as conceded
in the briefs of all parties, the principal issue in the present case
is whether or not the association has exceeded or abused the pow-
ers granted it by the Co-operative Marketing Act so as to create an
actual unreasonable restraint of trade.

We hold in the first place that upon the face of the charter, by-
laws and marketing agreements of this association they are not il-
legally monopolistic. This proposition has already been settled by
the Supreme Court in the Mason and Dunn cases. There is nothing
in the agreement requiring members to limit production. They are
not obliged to raise tobacco at all after they join the association.
Upon the face of it the association is in effect a selling agency, with
the middle man eliminated. A mere selling agency is not a mo-
nopoly and neither the common law nor the anti-trust statute ap-
plies to a genuine sales agency. Brown v. Staple Co-operative As-
sociation (Miss.), 96 So., 849.

The co-operative marketing system was forced into existence to
guarantee fair prices to the producer, a fair wage for the labor,
and to prevent extortion upon the consumer. It has increased con-
sumption by furnishing the consumer a regular supply and at the
same time enabled the laborer and the farmer to obtain a remuner-
ative return. It does not appear from the cases that the price to
the consumer has been increased beyond the real value of the pro-
duct. It has been repeatedly held that the expressed purpose of

stabilization of the market of an agricultural product is not monopolistic or in undue restraint of trade. Stabilization is for the purpose of preventing heavy or serious fluctuations, and maintaining an orderly state of the market so that a fair price above the actual cost of production may be maintained at a somewhat fixed and graduated figure. It involves sufficient control of the supply to prevent dumping of the products on the market in such quantities and at such times as would unreasonably depress the price. It even requires at times carrying over at least a part of a crop until a later time so that in an orderly way and at a fair price the supply may be absorbed by the demand. The products are pooled in the hands of the Co-operative Marketing Association to sell them from time to time under such demand as will bring reasonable prices. In the tobacco industry, as was pointed out by the United States Supreme Court in International Harvesting Co. v. Kentucky, 234 U. S., 216, 58 L. Ed.; 1284, combinations of tobacco growers are held to be no more than methods to restore an equilibrium that had been disturbed by a combination of buyers. The proof in this record is that there are only four principal buyers, and they were the constituents of the American Tobacco Company, known as the Tobacco Trust, before it was dissolved by the United States Supreme Court.

It is insisted that this association has been guilty of coercion or suppression of competitors, unfair or fraudulent rivalry, arbitrarily fixing and maintaining prices, limiting production, creating an artificial scarcity, and impairing the quality of tobacco. In our discussion of the facts we deem it proper to set forth briefly the history of the organization of this association. The relator insists it is an insidious, hurtful and unlawful combination masquerading under the guise of altruistic and beneficent purposes. It is clearly to be seen that the rapid increase in raising Burley tobacco in Tennessee necessarily affected the industry everywhere else. The industry had not only grown rapidly in Kentucky, but had spread to the states of Indiana, Ohio, Missouri and West Virginia, as well as to Tennessee. In Tennessee the tobacco has been marketed largely upon loose-leaf floors in the warehouses privately owned and conducted. The policy of the four principal buyers had been to encourage the warehouse and commission men because under the loose-leaf system they were able to purchase tobacco at prices most nearly acceptable to them. Even since the association began to do business in Tennessee, the non-members have been able to get better prices on the loose-leaf floors than the members derived through the association, because of this preference accorded by the buyers. The warehouse men in Knoxville at first charged the grower one-half of all over eight cents per pound which the tobac-

co would bring. Afterward they charged fifteen cents a basket plus fifteen cents a hundred pounds, plus three per cent of the selling price. It is not shown whether or not these charges amounted to as much to the grower as what was taken out by the association for expenses including two-fifths of a cent a pound for a fund for purchase of warehouses in Tennessee only, for which the grower received common stock in the subsidiary corporation of the association.

In the years, 1919 and 1920, Burley tobacco brought abnormally high prices due to the war situation, but in January, 1921, when the 1920 crop was being marketed, the market completely collapsed. Burley tobacco sold on the market in January, 1921, at as little as less than one- cent per pound, when the average price for the previous crop had been about thirty cents per pound. This collapse paralyzed the whole section in which Burley tobacco was being raised. At that time, very little Burley tobacco was being raised in Tennessee. Many people in Kentucky, stimulated by the high prices received in 1919 and 1920, had bought lands at very high prices, had made their first payments expecting to make their succeeding payments out of the proceeds of the crop of 1920. Very many people lost their all in these investments because they were unable to make their payments and they lost what they had already paid. It was a crisis involving the welfare of many thousands of people. Judge ·Robert |W.. Bingham, proprietor. of the Louisville Courier Journal and the Louisville Times, made an investigation of co-operative marketing associations, especially in California. Ascertaining that through the methods of these associations there had been great prosperity in the fruit raising and other industries in California, Judge Bingham induced Mr. Aaron Sapiro, counsel for more than thirty such marketing organizations, to come to Kentucky to aid in the organization of a Burley Tobacco Association. Judge Bingham loaned a large sum of money to the association when it was organized. Much of this money was used in making advances to the growers on their crops. Through a subsidiary corporation issuing eight per cent preferred stock, the association was able to acquire one hundred and twenty-four of the one hundred and twenty-six warehouses in the Burley district in Kentucky. Banks and other financial institutions co-operated. In January, 1922, the association advanced about ten cents a pound to its members on the tobacco delivered by them to its warehouses. For the balance it gave, and does give, participation certificates. It is said by Judge Bingham, in his testimony, that the effect of the work of the association was to lead from bankruptcy to prosperity. He also testified that since the association has been organized and has raised the price of tobacco, the price of the manufactured product has

gone down, but the reports show that the manufacturers have been able to make a good profit. The weight of the evidence seems to sustain this conclusion. This being true, the charge in the bill in this cause that the effect of the work of the association is to raise the price to the consumer, is not sustained. It may not be entirely due to the work of the association, but the elimination of the middle man and other economic wastes ought certainly to have a tendency to reduce the price to the consumer, although the price to the grower has increased. Judge Bingham also testified that it had never been the purpose or intention of the association, or its managing officers, to limit the production of Burley tobacco to Kentucky, that any attempt of that kind would defeat the purposes of the association to market the tobacco in such an orderly way as to get a fair price for it; and that if the association should attempt to get an unfair price its whole purpose would be defeated. He further testified that the association had put forth every effort to improve the quality of the tobacco. As he was the principal organizer, without whose assistance the organization would have doubtless been impossible, he is one of the principal persons who are charged in this cause with having sinister motives. When asked if he had personally profited directly or indirectly in any respect by the organization and operation of the association, he said that he had not except that he had had the pleasure of seeing a great many thousands of people benefited. Another leading personality in this movement is Mr. James C. Stone, the president of the association. It appears that Mr. Stone is an executive of great ability and has the tremendous responsibility of general management, including the selling of the tobacco. It is earnestly insisted that the Association was extravagant in paying to Mr. Sapiro about $52,000, as compensation for his services, and to Mr. Stone, a salary of $20,000 a year. The services of Mr. Sapiro involved unusual skill and responsibility. They included not only the formulation of the plan of the association, the marketing acts and the charter, but also the creation of subsidiary corporations to operate under a lawful financial plan for acquiring warehouses and other equipment. The directors of the association approved the fees out of much greater familiarity with the services than any court can have. The payment to Mr. Sapiro was made with funds derived in other states before the association began doing business in Tennessee. None of this money came out of the pockets of Tennessee farmers. Mr. Sapiro has an annual retainer of $5,000 as counsel for the association. We do not consider this unreasonable. Nor does the salary of Mr. Stone, as president and general manager appear exorbitant in view of the skill and responsibility involved. The agents and solicitors of the association are paid moderate salaries. We are unable to hold that

the directors have abused their discretion in paying these fees and salaries.

It is insisted that one effect of the operation of the association has been to intimidate tobacco growers into joining the association to their detriment. There is no proof of any night-riding, scraping plant beds, or other acts of intimidation in Tennessee. The weight of the evidence is that there have been sporadic cases in Kentucky but that the outrages were never perpetrated through any aid or encouragement, much less design, of the association. We are able easily to dismiss this charge against the association as totally lacking in any foundation of evidence.

It appears that the price of Burley tobacco for the 1920 and 1921 crops, together, averaged 13.37 cents per pound. The cost of raising tobacco is about twenty cents per pound. Under the operations of the association the growers have received twenty-two cents to twenty-eight cents per pound. Mr. Stone testified that following the organization of the association and after the year 1925, the production was doubled, and the prices to the consumer have decreased probably twenty to twenty-five per cent; and yet that in the past three years the manufacturers have had in earnings at least from twenty to twenty-five per cent more than they received before the association came into existence. It was estimated by Judge Bingham that during its first year of operation the association did $50,000,000 worth of business and increased the profits of its members by $40,000,000. It further appears that there was a very rapid increase in acreage of Burley tobacco in Tennessee from 1920 to 1924. There is much testimony in behalf of the relator that the work of the association in Tennessee had reduced or would reduce the acreage but the official report of the agricultural statistician of the Department of Agriculture for Tennessee shows that in 1924, there was upon the whole an increase in acreage of Burley tobacco in the counties in which it is grown in Tennessee, excepting one, and the testimony shows that in this, the county of Sumner, the reduction was due in part to a severe drought.

The agricultural extension service of the University of Tennessee has at all times encouraged the raising of Burley tobacco in Tennessee; but it has carefully refrained from taking part in this controversy and has neither advised growers to enter or stay out of the association. In the spring of 1924, it sent two experienced impartial investigators to Kentucky. They reported that eighty or ninety per cent of the tobacco growers in the leading tobacco producing counties of Kentucky, including practically all of the best farmers, were members of the association; that seventy-five to ninety per cent of the landlords, and seventy to eighty percent of the tenants, were satisfied with the association except that some of

them would not renew their contracts because of the delay in getting payments. They were especially affected by the fact that non-members were getting practically the same price and all of their money promptly upon delivery and sale of their tobacco at the loose-leaf tobacco warehouses. They reported that practically every man interviewed was of the opinion that the association had advanced the price of tobacco. Of course, if the association was holding up the price, the non-members got the benefit. What would have been the price had there been no association, does not appear. The same situation might exist in Tennessee. The non-members may be profiting heavily by the very existence and operation of the association. The production of Burley tobacco was increasing everywhere, as shown by the report of the investigators. It might be very natural for a tobacco grower to conclude that it would be to his interest to stay out of the association and receive the purchase price at an excellent figure in cash in the loose-leaf warehouses; but if the market were not stabilized and if all the growers forced their tobacco upon the market at the same time under such an individualistic system, by the operation of the law of supply and demand, the market might be again in a state of collapse. This is the very philosophy of the co-operative marketing system. The charge that the Tennessee grower is prejudiced under such circumstances may spring from but a single viewpoint and not from a full consideration of the operation of well-known economic laws.

It is not for the court nor other arm of the Government to determine whether or not a farmer should join an association of this character. To do so would be an invasion of private right. The farmers can make or unmake the association by joining or refusing to co-operate with it.

It is charged that the association came into Tennessee for the purpose of limiting production and depriving the Tennessee farmers of the advantage which they had through raising a superior grade of Burley tobacco; that the Burley tobacco industry in Tennessee, growing rapidly at that time, was regarded as a menace to the industry elsewhere; and that the effect of the plans of the association would be to reduce the price, depress the grower and cause him to grow less and poorer tobacco. These charges rest largely upon the mere opinions of interested witnesses. These witnesses are parties having interests in loose-leaf warehouses which may be profiting by the very operation of the association in the whole Burley tobacco area. The very fact that the acreage has not decreased shows clearly that the grower is not depressed. There is virtually no evidence that a poorer quality of tobacco is being produced. The testimony of certain witnesses that an agent of the association, upon his first visit to East Tennessee with reference to entrance into

the state by the association, declared that he regarded the tobacco industry in Tennessee as a menace to the growers elsewhere, is insistently denied by witnesses of equal credibility who heard his statements when they were made. Much stress is laid upon certain letters written by the President and General Manager of the association in July, 1923, to the Secretary of the Chamber of Commerce of Knoxville, in which he expressed a desire that a representative of the association might come to Knoxville to explain the work of the association and discuss the subject of over-production. It may be that the rapid growth of the Burley tobacco industry, due undoubtedly to the increasing prices received by the grower, made the officials fear that the supply might become highly disproportionate to the demand. Whether or not this was true, we cannot understand how a mere discussion of over-production, as proposed, would indicate that the effect of the work of the association would be to limit production so unduly as to prejudice the grower and the consumer. We must apply the rule of reason to such a proposition.

It is insisted very earnestly that there were what is known as "cut out" movements in Kentucky, fostered by the association. It is shown that there was an organization of growers to limit production, but although they may have been members of this association, the proof shows clearly that they were not aided or encouraged by the association. The "cut-out" movement was abandoned by them. The proof shows that the association, through its officers and agents and its declarations published far and wide, deprecated the idea of any "cut out," and this for the reason that any general agreement not to raise tobacco in a given year would be taken advantage of by growers elsewhere and therefore, would be impracticable. We will discuss the subject of efforts to limit production as an economic expedient in a later portion of this opinion.

It is charged that the effect of the association in Tennessee would be detrimental to the Tennessee grower because the association would take his tobacco, mix it with inferior grades and deprive him of the unusually high price to which he would be entitled. Under the Co-operative Marketing System, the tobacco is placed together in warehouses according to grades. Of course, the price received depends upon the grade of the tobacco sold. Under the loose-leaf system, the grading is done arbitrarily by representatives of the buyers. Under the co-operative system the growers are protected against arbitrary or oppressive treatment by the buyers. The classification has been set under government supervision. We see no reason why such superior tobacco would not, under this system, be given its proper grade and the purchaser derive the rightful benefit therefrom. If Tennessee tobacco is superior to Kentucky tobacco it should be graded in a higher classification and bring

a higher price.  There is no evidence that grading has been done to the detriment of the grower and we are not willing to deal with this as a mere theory.  If there were any abuse incident to this method of mixing and grading, an individual member aggrieved by it would have his own remedy in a judicial proceeding.

It appears that selling by grades, under the co-operative system, would not materially affect the price, for the grower is credited with the price according to the grade of tobacco produced by him. It may be that the best grade of tobacco raised in Tennessee would bring more on the open market than the best grade of tobacco raised in Kentucky, and that the non-member selling in the loose-leaf warehouses would receive his higher price promptly; but it appears probable, from the evidence, and from a consideration of the operation of a wholly competitive system, that the producer of the superior tobacco is receiving this higher price by reason of this very stabilization of the market; that under a wholly competitive system he would not receive more for such tobacco than what he would receive under the uniform grading and co-operative marketing system.  And this is at last a question, not for a governmental agency; but for the individual grower, to determine.

Another charge earnestly made is that the grower received from two to seven cents less than the price received by the association. Much testimony was taken upon this issue.  It will be remembered that the charter of the association and the Co-operative Marketing Act provide that the grower shall receive all the tobacco brings less the cost of operation and selling.  It is not charged that there has been any misappropriation of the funds of the association.  It is merely insisted that its expenses are excessive and that it has not fully accounted to the growers for the moneys received by it.  As to this charge the relator has not successfully carried the burden of proof.  This is not a proceeding for an accounting in behalf of the members.  It appears that final statements have been made by the proper officers of the association and published from time to time as provided by the by-laws.  It does not appear that any of these are false statements.  It does appear that the association does a vast business and must necessarily incur much expense; but in spite of the refusal of the President of the association to disclose his contracts with the buyers, we do not presume that a full disclosure would show that the growers have not received what was due them; nor are we prepared to say that even a failure to make a full accounting would be ground for enjoining the association from doing business in Tennessee.  There would be other and more direct remedies to correct an evil of this character without depriving the growers of Tennessee of the benefit of a co-operative marketing system, if there were such benefit.  We do not approve of the re-

fusal of the President to furnish this information when called up-on, although we think it possible that it might have been detrimental to the association for such facts to be published so that all the buyers might have the benefit of knowledge of them. We are not willing, however, to regard this as any material basis for a judgment of ouster or an injunction.

Prior to 1923, when the association began to solicit members in Tennessee, the growing of Burley tobacco as a commercial enterprise in Tennessee had been limited to Greene county, in which the industry had become very substantial. Greeneville had become a marketing center, and warehouses and other facilities had become established to facilitate the handling of the crops. It appears that one of the largest warehouses in Greeneville was owned by a representative of one of the four principal buyers of tobacco. At a later time, as a result of the encouragement given by the University of Tennessee and by business men in Knoxville, the raising of Burley tobacco in East Tennessee was rapidly increased. The growers were marketing their tobacco very largely through the loose-leaf warehouses in Greeneville and Knoxville. The association purchased or rented warehouses for use as receiving stations for receipt of the tobacco grown by its members in Tennessee at Gallatin, Sweetwater, Knoxville, Jonesboro, Kingsport, and College Grove. It is contended that the association has engaged in unlawful competition with the proprietors of loose-leaf warehouses. The Chancellor found that the perfection of this organization had the effect, to the extent that it was carried out, to destroy this opportunity for competition in the sale of tobacco, to force the grower to submit to such prices as the manager of the association might dictate to the buyers and to accept such prices as the manager of the association might decide to account for. But the evidence shows that growers, who are non-members of the association, are not faring worse by reason of the work of the association. If the effect of the Co-operative Marketing System is to diminish the business of proprietors of loose-leaf warehouses, but not to the disadvantage of the growers, it is but a natural effect of change in economic methods and an incident to methods in themselves competitive. It is for the grower to determine which method he will adopt for marketing his produce. The judicial process should not be applied in behalf of those who would invoke it for business advantage where the general public, and consumers of products, do not suffer from what is complained of.

Much is said of the fact that the sale of the tobacco by the association is in the hands of one man, its general manager, and that he has the power arbitrarily to fix and maintain the prices. This power might be dangerous, but an undue exercise of it would un-

doubtedly defeat the purposes of the association. It does not appear that it has been unduly exercised. When we consider that the prices already received have not been unreasonable, that the prices paid by the consumer have been less than before and that the buyers have enjoyed an increase of profits, we are at a loss to find any facts indicating either that the association has held up the market at unreasonable prices or that it will do so. This very proposition was necessarily involved in the Mason and Dunn cases and a fair interpretation of the holding of our Supreme Court is that the existence of this power in the hands of the general manager, supported by a board of directors, does not render the association illegally monopolistic.

It is insisted as another ground for sustaining the bill, that this association is generally not a non-profit organization because its uniform or marketing agreement, provides for subsidiary corporation having capital stock, for acquiring by lease or purchase, warehouses, drying or curing plants, storehouses or factories or other places to handle, treat, process, manufacture and warehouse or store any or all of the tobacco delivered by members to the association. The directors are given unlimited discretion as to establishing these subsidiary corporations with the sole limitation upon this exercise of discretion that a majority of the members of the association may file a written protest within two weeks after they receive the written notice of the intention to organize such corporation. These corporations are authorized to issue common stock which shall be sold to members at par but no member shall purchase, originally or directly, more than one share. In addition to this common stock, these corporations may issue preferred capital stock not to exceed two cents for each pound of tobacco of the 1920 crop covered by the membership of a given district, which may be increased proportionately as the membership increases. This preferred stock bears eight per cent cumulative dividends and is subject to retirement with a bonus of two per cent at the rate of one-fifth thereof annually beginning June, 1923. Calculated on the basis set out in the contract, there can be issued five million dollars in preferred stock upon which are guaranteed yearly dividends of eight per cent and no member can buy directly over one share of the common stock, although there is no limitation upon the indirect purchase of the common stock. Under the marketing agreement, the association is entitled to deduct from proceeds of sales of tobacco amounts sufficient to pay a dividend of eight per cent on the outstanding common stock and the dividends on the outstanding preferred stock, and to retire each of the calendar years, beginning 1923, one-fifth of the preferred stock, a sufficient amount for taxes, insurance, depreciation, betterment and other

necessary expenses, in the judgment of the directors of the association. How such an association can be established and function without the warehouses and the other plants so to be acquired, it is difficult to understand. A corporation for general welfare without power to raise money by sale of stock must have some means of providing funds for these purposes. It has already been shown that the amount taken out of the purchase price of tobacco for making purchases of such equipment is credited to the grower in common stock. This is part of the co-operative scheme or system. We are of the opinion that it is comprehended within the power granted to the association in the Co-operative Marketing Acts and within the necessary purposes of the association. We do not understand how the association could very well otherwise acquire such facilities which are so vitally necessary to its existence and operations. In Tobacco Growers' Co-operative Association v. Jones, 185 N. C., 265, 116 S. E., 174, 33 A. L. R., 231, it was held that the use by a Co-operative Marketing Association of some of its money in the formation of subsidiary companies for the preparation of its products for market does not render the association void as a monopoly. The court very aptly said:

"The enemies of the co-operative system would be delighted if the courts were to hold that a co-operative association is not permitted to use its own money in establishing warehouses, prize houses, redrying and processing plants, and were forced to depend for these facilities upon such terms as the association could make with its competitors. The latter would be in the position of an army well armed meeting in battle another army with no arms at all. The co-operative association is merely granted by the statute the privilege of building or constructing the necessary instrumentalities for carrying out the purposes of the association and of using its own money therefor, under terms and conditions specified in the contract and agreed to by all its members."

Upon the subjects which we have just treated we cannot express our conclusions in better form than by adopting the following excerpt from the opinion of the Supreme Court of Ohio, respecting the association here in question, in the case of List v. Burley Tobacco Growers' Co-operative Association, delivered on March 16, 1926. reported in 151 N. E., 471:

"It has already been shown, that the testimony does not show that any unfair methods were employed in the marketing of tobacco, or that the methods which were in fact employed were calculated to injuriously affect trade and commerce, or to increase the cost of the finished product to the consumer. There has been no effect to crush or oppress other producers

of tobacco; nor does the evidence tend to show any agreement to limit or reduce production. It is true, that the association carried on certain educational work, and freely advised its members as to marketing conditions and the supply and demand in the tobacco industry, and even advised the growers to grow less tobacco and employ their lands in raising alfalfa and other forage producing and soil-building crops. Such efforts on the part of the association differed in no wise from the efforts of the federal Department of Agriculture, but, on the contrary, coincide perfectly with the efforts of the federal Secretary of Agriculture in all agricultural lines. The bulletins issued by the federal department show wide fluctuations in the volume of agricultural products, and it is the purpose of the department to try to bring about a more even and uniform production of all such products. Nothing is so conducive to speculation as the fluctuation of production, and nothing is so well calculated to promote normal relations between the producer and the consumer as a regular supply of products in accordance with a normal demand for same. Nothing is better calculated to shorten the distance between the producer and the consumer. There has been a consistent effort on the part of our federal government for the last 50 years to bring it about that the country may become as nearly self-sustaining as possible. A failure to accomplish this laudable purpose must lead to dependence upon a foreign food supply and to dissatisfaction and consternation among our agricultural producers. The American government and the American people are committed to the maintenance of a resourceful, independent agriculture, and it should be the effort of all the branches of our government to aid agriculture in maintaining its proper place in our economic structure, on equal terms with all other producing groups. Information upon the subject of agricultural production is necessary to the American farmer in helping him to plan his annual crops, and upon no sound theory can it be claimed that this information amounts to an unlawful restraint of trade. The Secretary of Agriculture in a recent public address declared that which everybody knows, to-wit:

" 'Fluctuations in prices are due to economic surpluses more than to any other single cause.' A surplus is always desirable, but it should be only a reasonable surplus, including a necessary carry-over from one season to the next. It should never be overproduction beyond the domestic and world demand. The information which has been given in this case has only been of that character which might properly serve to guide intelligent programs of production. The following quotation

from the last annual report of the Secretary of Agriculture is pertinent to this issue:

" 'A comprehensive system of standards and grades for farm products should be set up. The Department of Agriculture has made considerable progress on this subject. It has already secured establishment of standards and grades for a number of major crops. Its cotton standards are accepted in the world's markets. Such action reduces hazard in marketing and diminishes the margin between the farmer and consumer. Warehouses and temporary storage facilities should be made adequate and stored farm products given a credit status on a par with other commodities. The act permitting federal licensing of warehouses illustrates what can be done. Cold storage and merchandise dependent thereon can be developed beyond present limits.'

"One of the grounds of complainant in this case is that this association has purchased warehouses, and stores therein the tobacco of its members, and the foregoing pronouncement of the Secretary of Agriculture is therefore not only quite significant, but also clearly supports the soundness of the policy of this association and approves the legality thereof.

"The only fact in this case tending to indicate an effort on the part of the association to establish a fixed standard of prices is the storage of the tobacco beyond the year of its production, as was apparently done for the first year after the organization of the association. Clearly it is an unsound business policy, as well as an unsound economic policy, and, if it was the purpose of the association in storing the crops beyond the year of its production to force the manufacturers to pay an abnormal price for the same, that mistake has been demonstrated and the association has already been properly punished. There are too many independent producers to permit such a plan to be successfully carried out, and this fact has been demonstrated by the constantly increasing production of Burley Tobacco from year to year since the organization of this association. The government reports clearly indicate that this co-operative effort is stimulating increased production, and the reason is not far to seek. The mere fact of stabilizing marketing conditions has inevitably caused a steadier market and an increased production.

"Anti-trust legislation is aimed to prevent monopoly. A monopoly in general means the concentration of business in the hands of a few, or a combination for the purpose of raising or controlling prices. Applying this definition to the instant case, it is apparent that the business of raising tobacco has not been

concentrated into the hands of a few persons. More than 100,-000 growers are in the pool, but one-fourth of all the growers are outside of the pool and it is apparent that those who are outside are getting as good prices for their product as those who are within the pool. It is apparent that the pool is not able to control prices. The census shows that there are more than 6,000,000 farmers in the United States, and it is manifestly impossible to 'corner' any branch of agricultural productions. The number of growers of Burley tobacco is not made to appear in this record, but it is indicated that there are only 4 manufacturers of any consequence. Whether or not there is a larger number than 4 is not material, because it is quite certain that the number of manufacturers of Burley tobacco is quite limited and the number of growers is quite large. The situation is summed up by Judge Mauck, who wrote the opinion of the Court of Appeals, in the following cogent statement:

" 'In any event, the number of domestic purchasers of raw tobacco is limited, and as a matter of common knowledge we take it as beyond dispute that in foreign countries there are state monopolies of tobacco that have the effect to diminish the number of purchasers in foreign markets. Moreover, the quality of raw tobacco widely varies. In fact, there would seem to be a greater variation in the quality of this product than of any other known to us. A producer of a modest crop may find that his crop consists of literally dozens of grades. It requires expert knowledge to sort a crop, getting like qualities separated from tobacco of dissimilar qualities. The grower not only lacks the knowledge necessary to properly sort and grade his own product, but if he could do so he would have so many different grades in a modest crop that he could only advantageously dispose of his crop by securing such different purchasers for the different grades as should happen to be interested in a particular grade. These suggestions, based on common knowledge, warrant us in saying that there are the strongest of reasons why those engaged in growing tobacco should be permitted to pool their tobacco for sale through a common agency, and that such pooling, far from tending to destroy commerce, tends to promote it, and that such pooling is not only within the spirit of modern legislation, but without such legislation would until a more satisfactory method is established constitute a well-nigh indispensable step in the transportation and marketing of this product under such conditions as would afford the grower a fair opportunity to sell his product under fair and equal conditions.'

"This controversy involves a legal problem, but the legal problem cannot be entirely divorced from the economic problem. It is not a question of control, but of reasonable regulation. There is no purpose to monopolize, but rather a purpose to stabilize, the production and marketing of Burley tobacco. We therefore agree with the trial court that there is no evidence of price fixing or other unlawful manipulation of normal conditions of supply and demand."

Another ground for inhibiting this association from doing business in Tennessee is that certain of its solicitors for membership misled farmers by misrepresentations of fact. It is charged, and there is testimony of a few farmers to sustain the charge, that misrepresentations were made to them as follows:

(1) That the grades as fixed by the association would be accepted by the buyers;

(2) That the members would receive advance payment of cash on their crops equal to the price received over "looseleaf" floors;

(3) That in addition to the cash advance, which would amount to one-third, they would receive participation receipts that could be cashed at the bank, or, upon which the banks would loan their face value;

(4) That the loose-leaf warehousemen were making excessive profits and robbing the growers;

(5) That the growers of Burley tobacco would have no place to market their crops unless they belonged to the association—that the association had bought up the warehouses;

(6) That warehouses would be located at favorable locations for the delivery of the crops by members;

(7) That the association would guarantee a profit to the growers;

(8) That the University of Tennessee and those in charge of its Extension Department were favoring and backing the efforts of the association.

The proof shows that misrepresentations, if made, were made in the face of positive instructions of the officers and field superintendents that the solicitors tell the real truth about the association and is purposes. Much of the testimony as to the misrepresentations is mere hearsay. The testimony is given by only a very small number out of more than twenty-four hundred members of the association in Tennessee. There is no evidence of general dissatisfaction among the members in Tennessee. The testimony as to misrepresentations is denied by the solicitors themselves. Evidently there were many misunderstandings of the statments made by the solicitors. The Chancellor, in his oral opinion, held that such statements,

if made by the solicitors, would not in themselves be sufficient to justify a finding that the association was violating the anti-trust laws. We are of'the opinion that in this holding he was correct. The membership or marketing agreement signed by the members sets forth very clearly the purposes and methods of the association in taking over the tobacco of the growers and marketing it, including all proper deductions for expenses, and the creation of a fund for establishing warehouses and other facilities within the respective districts of the signers.

In Dark Tobacco Growers' Co-operative Association v. Mason, 150 Tenn., 228, our Supreme Court, speaking through Mr. Justice Hall, applied the rule that because a contract is harsh, oppressive, unjust and inequitable, it is not rendered invalid. We do not find that this marketing agreement is of that character; but in view of this principle, we cannot consider this agreement as ground for enjoining the association from doing business within the state. Now the evidence is clear that the alleged misrepresentations were not made by the authority of the association; but, as was held in the Mason case, evidence as to parol collateral agreements was clearly incompetent and inadmissible. In that case, the court held that if the complainant had been a corporation, and representations contrary to, or not comprehended within, the provisions of the written agreement, even when made by persons authorized by the corporations to make them, clearly would have fallen within the statute of frauds and would not have been binding upon the association.

In the Mason case the issue was directly between the association and a member who claimed that he had been fraudulently induced by misrepresentations to sign the contract. Aside from the incompetency of this testimony, the fact that in conversations between the solicitors and a few farmers extravagent assurances were given and some misunderstandings were had, when clearly these matters were merely incidental and unauthorized, would not justify us in holding that the probable effect of the operations of the association would be unduly to restrain trade and effect a monopoly.

We have thus far dealt with the issue in this cause without reference to the contention of the appellant that the business in which it was engaged in this state was interstate commerce, which is a commercial transaction between citizens of different states. State v. Scott, 98 Tenn., 254, 39 S. W., 1, 36 L. R. A., 461.

The association was duly licensed to do business in Tennessee. This rendered it subject to regulation under the police power of the state. American Steel & Wire Co. v. Speed, 110 Tenn., 524. In Standard Oil Co. v. State, 117 Tenn., 620, our Supreme Court, construing our anti-trust act, said:

"A combination affecting interstate commerce is nonetheless a violation of the anti-trust statute of the state and punishable under it, where the agreement made under it affects interstate commerce."

In List v. Burley Tobacco Growers' Co-operative Association, supra, the Supreme Court of Ohio, while recognizing the force of the claim that the contract between the Kentucky Corporation and the member in Ohio was an interstate transaction, held that inasmuch as that subject seemed to be involved in confusion and controversy. it was preferable to dispose of the case upon the theory that it was an intrastate transaction. Likewise, we have preferred to deal with the case before us.

In the last analysis this controversy turns upon the question of public policy. While the police powers of the state may be exerted under the statutes, with reference to economic problems, there is much danger of transcending the power thus given, in order to interfere with contractual relations and situations of a purely business character. Whether the co-operative marketing system is or not economically beneficial is not primarily a judicial question. As an economic question it may be dealt with governmentally by the legislative department. The legislature has manifestly treated as a favored class, persons engaged in agriculture, as they are so widely scattered and compose so numerous a class that it is a physical and economic impossibility to combine them all in any commercial enterprise. Many of them are very small producers of such limited means that they must market their products immediately after harvesting and are therefore at the mercy of purchasers without any voice whatever in making prices or terms. Merchants and manufacturers are not of such character nor are they so situated. Recognizing the apparent necessity of co-operative marketing of farm products, the legislatures of at least two-thirds of the states and the Congress of the United States have enacted statutes legalizing the system, and not only have these statutes been held constitutional, but the standard marketing contracts made by associations with their members, have been held valid and enforceable in a long line of cases so numerous that we will not undertake to cite them. Most of them will be found in the Notes in 25 A. L. R., p. 1090, and 33 A. L. R., p. 247. Later cases in addition to those already cited herein, are: Burley Tobacco Growers' Co-operative Association v. Rogers (Ind), 150 N. E., 384; Dark Tobacco Growers' Co-operative Association v. Robertson (Ind.), 150 N. E., 106; Rifle Potato Growers' Association v. Smith (Col.), 240 Pac., 937.

Upon a careful consideration of all the facts presented in the large record in this cause, we are unable to agree with the conclusions of law or fact reached by the Chancellor as grounds for sus-

taining the bill in this cause. We do not think that the association in question has practiced unreasonable restraint of trade, fraudulent rivalry or coercion, illegal suppression of competition, undue limitation of production, impairment of quality, decreasing wages or price of materials; or that it is manifest that such will be the probable effect of the operation of the association.

In State ex rel. v. Cumberland Tel. & Tel. Co., 114 Tenn., 194, the Supreme Court, speaking through Chief Justice Beard, said:

"Courts act with extreme caution with proceedings which have for their subject a forfeiture of corporation franchises, and we think that the great weight of authority is that a court may exercise its discretion, and should refuse a judgment of forfeiture if upon the whole case it finds that the interest of the public does not require it."

In State v. Merchants Insurance & Trust Co., 8 Humph., 234, the court quoted approvingly from Angell and Ames on Corporations, to the effect that in general, to work a forfeiture, there must be something wrong, arising from wilful abuse or improper neglect; something more than accidental negligence, excess of power or mistake in the mode of exercising an acknowledged power. In other words, it would seem that a mere negligent or mistaken exercise of power would not of itself work a forfeiture.

In 8 Waits' Supplement to Actions and Defenses, p. 488, it is declared:

"In order to entitle the state to forfeiture of the charter of a corporation, it must show some grave misconduct on the part of the latter, some sin against the law of its being, not merely formal or incidental, or affecting only private interests, but material and serious, and which has produced or tends to produce injury to the public. People v. Sugar Refining Co., 121 N. Y., 582; 18 Am. St. Rep., 843."

The evidence in the case before us fails, in our opinion, to meet the requirements set forth in the foregoing rules. These requirements are applicable to a proceeding to deprive a foreign corporation, duly licensed, from further doing business within the state of Tennessee.

We have disposed of this case with the greatest respect for the late Attorney-General, for his learning, ability, zeal and his sincere motives in instituting this proceeding; but we are unable to hold upon this record that this association should be inhibited from further carrying on a system of co-operative marketing of Burley tobacco. Whatever may be the practices of the association in the future, neither it nor the Tennessee farmers favorable to it have, in our opinion, become subject to be deprived of its right to do

business in Tennessee. The decree of the Chancellor is reversed, the injunction is dissolved and the bill is dismissed. The costs are adjudged against the state. The clerk will certify the bill of costs to the Comptroller for payment.

. Portrum, P. J., and Snodgrass, J., concur.